676 A.2d 639

COMMONWEALTH of Pennsylvania, Appellee,

v.

Robert COOK, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 24, 1995.

Decided May 20, 1996.

364

Ramy I. Djerassi, Philadelphia, for Robert Cook.

Catherine Marshall, Philadelphia, for Com.

Robert Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION OF THE COURT*

CASTILLE, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of Philadelphia County.[1] Following a jury trial, appellant was convicted of first degree murder,[2] criminal conspiracy to commit murder,[3] possession of an

1. 42 Pa.C.S. § 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. § 903.

instrument of crime[4] and robbery.[5] The jury found three aggravating circumstances[6] and no mitigating circumstances and returned a sentence of death. Post-verdict motions were denied and the trial court imposed the death sentence for the murder conviction. In addition, the trial court sentenced appellant to a consecutive term of ten to twenty years imprisonment on the robbery conviction, a consecutive term of five to ten years imprisonment on the criminal conspiracy conviction and a consecutive term of two and one-half to five years imprisonment on the conviction for possessing an instrument of crime.

### SUFFICIENCY OF THE EVIDENCE

Although appellant does not challenge the sufficiency of the evidence, as in all cases in which the death penalty has been imposed, this Court is required to independently undertake a review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to support all the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Carpenter*, 511 Pa. 429, 435, 515 A.2d 531, 533–34 (1986). After a review of the record, we find that the evidence is sufficient to support appellant's conviction.

**4.** 18 Pa.C.S. § 907.

**5.** 18 Pa.C.S. § 3701.

**6.** The aggravated circumstances were that appellant committed the killing while in the perpetration of a felony (robbery), 42 Pa.C.S. § 9711(d)(6), and that appellant had been convicted of two other first degree murders committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or appellant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense, 42 Pa.C.S. § 9711(d)(10).

At trial, Commonwealth witness Sondee Harmon testified that on December 6, 1986, she met with appellant, Raul Serrano and appellant's uncle to discuss with appellant a plan that appellant had for them to make some money. Appellant explained that he knew a man, whom he identified as Alvin Tyler, from whom they could steal a VCR and a substantial amount of money which Tyler had amassed from dealing drugs. Appellant cautioned Harmon that they would have to kill Tyler in order to steal the VCR and the money. Harmon testified that she would not agree to the murder of the targeted person and that appellant, therefore, had to agree that they would not kill the man or else she would not participate. Appellant explained to her that the plan was that appellant would get them all into the victim's house by telling the victim that he was bringing a woman for the intended victim, appellant and Serrano to have sex with, and that while Harmon and the victim were upstairs in the victim's house, appellant and Serrano would steal the VCR and search for money downstairs.

After they agreed to appellant's plan, the three of them proceeded to the house of Paulette Duncan, at which time appellant directed Serrano to retrieve a paper bag from the trunk of appellant's car. Harmon observed appellant remove a knife from the bag and place it under his jacket. After visiting a local bar, the three proceeded across the street to the home of the intended victim. The unsuspecting victim invited the three cohorts into the house and offered them each a beer. While the victim was in the kitchen, appellant told Serrano and Harmon not to take the beer or touch anything in the house because they would leave fingerprints. However, appellant, who was wearing gloves, accepted a beer and the four then smoked some marijuana. The victim then asked Harmon to join him upstairs to finish smoking the marijuana cigarette and, after a nudge from appellant, Harmon went to the front bedroom on the second floor with the victim.

Shortly thereafter, appellant and Serrano joined them upstairs. Once everyone was in position, Serrano grabbed the victim's arms and pulled them up over his head. At the same

time, appellant took the knife out from under his shirt and plunged it into the victim's chest. Harmon ran from the room and Serrano followed her downstairs, where he found her hiding behind the couch. While downstairs, Serrano and Harmon heard sounds of a struggle upstairs. Shortly thereafter, appellant came to the top of the steps, yelled for Serrano to come back upstairs and asked if Serrano had found one of his gloves, which he had lost in the house. When Serrano returned to the second floor, Harmon noticed blood dripping from the ceiling.

When appellant came downstairs, he removed his bloodsoaked jacket and replaced it with another apparently belonging to the victim. Appellant then placed the knife in a paper bag which he took from the house and the three departed. In the car, appellant joked that the deceased was a "tough dinosaur" who had to be stabbed repeatedly before he died. He also stated that the killing got his adrenaline flowing. The three returned to Duncan's house, where appellant retrieved two plastic bags into which he placed his bloody jacket, his one remaining glove and his knife before disposing of them in a dumpster.

Appellant drove Harmon home about thirty minutes later and he warned her that if she told anyone about the murder he would harm her family. He then gave her $200 and a substantial amount of marijuana. Serrano received a similar amount of money, although appellant stated that Serrano did not deserve any money because he had not taken the victim's VCR as planned.[7]

Darcyne Brown, an acquaintance of appellant's, testified that she spoke to appellant two days later, on December 8, 1986, and that, at that time, he told her that he had murdered someone down the street from Paulette Duncan's house. Later that day, appellant again bragged about the murder while Brown drove with him to take Serrano to the airport. Appellant and Brown went to Duncan's house later that evening and, upon sighting the police at the victim's house, appellant

7. Both Harmon and Raul Serrano testified at trial regarding these events.

stated in Brown's presence, "What, they're just finding the body?" After making this remark, appellant told Brown not to tell Duncan, who was by then hysterical, that he had killed the victim.

Police arrived at the victim's residence because earlier that evening, Philadelphia Police Officer Patrick Doherty was stopped by two men who told him they believed their friend was dead and directed him to the victim's house. Officer Doherty found the front door unlocked and, upon entering the house, immediately noticed blood dripping from the ceiling in the living room. The officer proceeded to the second floor, where he observed the victim Tyler naked from the waist down lying in a pool of blood in the front bedroom. Officer Doherty also noticed a large gash behind the victim's right ear. When the body was later moved, a brown leather glove, identified at trial as belonging to appellant, was found underneath the body.[8] Appellant was arrested on August 7, 1987, after Harmon gave a statement to police on July 14, 1987, implicating appellant in the murders.[9]

Evidence is sufficient to sustain a conviction for first degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the

**8.** Dr. Robert Catherman, a deputy medical examiner in Philadelphia, testified that the victim had been stabbed three times in the upper left chest, three times in the left flank, twice in the back of the head and once in the hand. The two most significant wounds consisted of a five and three-eighths inch wound to the chest which punctured the lung and a wound to the head which ruptured the right vertebral artery. The wound in the hand was a defensive wound. Dr. Catherman testified that the death had resulted from the combined effect of the eight stab wounds to the body and the loss of blood from the two most serious blows.

**9.** Appellant's co-conspirators, Sondee Harmon and Raul Serrano, were also arrested and charged with the victim's murder. However, prior to trial both Harmon and Serrano entered open guilty pleas of third degree murder, conditional on their cooperation at appellant's trial.

body. *Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800, 802 (1972). Here, ample trial evidence consisting of extensive eyewitness testimony and testimony regarding inculpatory statements appellant made to numerous parties demonstrated that appellant deliberately planned to murder the victim in order to steal certain of his possessions. He then successfully carried out his plan with the assistance of his two cohorts by stabbing the victim to death and stealing money and drugs from the victim's residence. Such evidence clearly established that appellant intentionally murdered the victim with the malice aforethought required for first degree murder. Therefore, no relief on this basis is warranted.[10]

## COURT'S REFUSAL TO GRANT A MOTION FOR A BENCH TRIAL

▮▮▮ Appellant first argues that the trial court abused its discretion in refusing to grant his request for a bench trial. Appellant has no absolute right to a bench trial. *Commonwealth v. Miller,* 541 Pa. 531, 552–53, 664 A.2d 1310, 1321 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). *See also, Singer v. United States,* 380 U.S. 24, 34, 85 S.Ct. 783, 789–90, 13 L.Ed.2d 630 (1965) (no right to a bench trial under the United States Constitution). The decision of whether to grant a defendant's request for a bench trial is within the sound discretion of the trial court. *Miller, supra; Commonwealth v. Sorrell,* 500 Pa. 355, 362, 456 A.2d 1326, 1328–29 (1982).

In the present case, the trial court denied appellant's request for a non-jury trial because the court had recently presided over appellant's prior murder trial and felt that as a result it could not be an impartial fact-finder. *Miller, supra*

---

**10.** In addition to the evidence previously discussed, evidence at trial also revealed that several months after the murder, Brown and appellant's common-law wife, Anna Serrano (who was also Raul Serrano's sister), were watching a karate movie with appellant when he commented that he had used one of the techniques in the movie on the victim. In addition, appellant's wife testified that several weeks prior to the murder, the victim had made sexual overtures to her and that appellant had casually responded by telling her "not to worry." N.T. 11/2/88 at 983–96.

(court should consider prior exposure to inadmissible evidence; court properly exercised discretion in denying motion for bench trial where court had determined that its partiality was potentially tainted by exposure to inadmissible evidence of other crimes); *Sorrell, supra* (court properly exercised discretion in denying motion for bench trial where court had determined that its partiality was potentially tainted by exposure to defendant's record in pretrial proceedings). Given the court's exposure to appellant's prior record and its knowledge that appellant had other first degree murder convictions, we find that it was a proper exercise of the trial court's discretion to deny the request for a bench trial.

## *SPEEDY TRIAL*

Next, appellant claims that the trial court erred in denying his motion to dismiss under Pa.R.Crim.P. 1100. Rule 1100 provides that a trial must commence at most no later than 365 days from the date on which the criminal complaint is filed unless there is excusable delay caused by the defendant, his counsel or court congestion.[11] The criminal complaint was filed against appellant on August 6, 1987, and appellant was arrested the following day. Therefore, the "mechanical run" date prior to consideration of any excludable time was August 5, 1988.[12] Appellant was not tried until October 18, 1988.

11. Appellant was arrested on August 7, 1987, prior to the amendment of Rule 1100. Under the old rule, a defendant was entitled to have the charges against him dismissed if he was not brought to trial within 180 days of his arrest. However, the original run date of February 2, 1988, had not passed when the rule was amended effective December 31, 1987, and therefore the 365 day time limit applies. *Commonwealth v. Spence*, 534 Pa. 233, 243 nn. 3–4, 627 A.2d 1176, 1181 nn. 3–4 (1993) (where 180 day run date had not expired when Rule 1100 was amended to provide for 365 day run date, 365 day run date applies to capital defendant, who is not entitled to bail).

12. The mechanical run date is the date by which the trial must commence under Rule 1100. It is calculated by adding 365 days (the time for commencing trial under Rule 1100) to the date on which the criminal complaint is filed. As discussed herein, the mechanical run date can be modified or extended by adding to the date any periods of time in which delay is caused by the defendant. Once the mechanical run date is modified accordingly, it then becomes an adjusted run date.

Because the trial commenced beyond August 5, 1988, we must determine the basis for delay and whether any such time was excludable so as to justify the trial court's refusal to grant appellant's Rule 1100 motion. Any delay caused by the need to reschedule a trial because of a continuance attributable to the defense constitutes excludable time, whether or not the defendant was prepared to go to trial at an earlier date. *Commonwealth v. Robinson,* 498 Pa. 379, 386, 446 A.2d 895, 899 (1982). When the excludable time is taken into account, the Commonwealth had until November 11, 1988, to bring appellant to trial. Because appellant *was* tried before the adjusted run date of November 11, 1988, appellant's claim must fail.

The docket in the record reflects the following activity affecting the trial date and the run date:

1. 8/8/87—Appellant filed a motion to quash which was disposed of by the court on 9/2/87 (13 days excludable time), resulting in an adjusted run date of 8/18/88.[13]

2. 9/2/87—Case continued to 10/8/87 for pre-trial motions and discovery (no excludable time).

3. 10/8/87—Case continued to 11/16/87 for status listing (no excludable time).

4. 11/16/87—Appellant's attorney was permitted to withdraw and new counsel entered an appearance on 12/8/87 (22 days excludable time), resulting in an adjusted run date of 9/9/88.[14]

All parties apparently proceeded under the mistaken belief that the 1987 amendments were inapplicable, and the Commonwealth petitioned for extensions under the old Rule 1100 before the run dates as calculated under that rule. However, the provisions of the rule providing for petitions for extension were deleted in the 1987 amendments.

**13.** Pa.R.Crim.P. 1100(c)(3)(i); *Commonwealth v. Chilcote,* 396 Pa.Super. 106, 113, 578 A.2d 429, 432 (1990), *appeal dismissed,* 533 Pa. 357, 625 A.2d 614 (1993) (time between the filing of pre-trial motion and court disposition of the motion is excludable); *Commonwealth v. Riffert,* 379 Pa.Super. 1, 10, 549 A.2d 566, 571 (1988), *alloc. denied,* 522 Pa. 602, 562 A.2d 825 (1989) (same).

**14.** Pa.R.Crim.P. 1100(c)(3)(i); *Commonwealth v. Manley,* 503 Pa. 482, 485, 469 A.2d 1042, 1044 (1983) (where a defendant who has not

5. 12/8/87—Case continued to 12/23/87 on Commonwealth motion to consolidate (no excludable time).

6. 12/23/87—Case continued to 1/28/88 for status (no excludable time).

7. 1/28/88—Case continued to 2/25/88 on defense motion (28 days excludable time), resulting in an adjusted run date of 10/7/88.[15]

8. 2/25/88—Case placed in ready pool.

9. 2/29/88–3/4/88—Appellant was unavailable because he was on trial for a prior homicide (5 days excludable time), resulting in an adjusted run date of 10/12/88.[16]

10. 9/12/88–9/23/88—Appellant was unavailable because he was on trial for another prior homicide (11 days excludable time), resulting in an adjusted run date of 10/23/88.[17]

11. 9/27/88—Case continued to 9/29/88 for status (no excludable time).

12. 9/29/88—Appellant himself requested a continuance, over counsel's objections, because he claimed he was not ready to proceed to trial. Case was continued to 10/11/88 (12 days excludable time), resulting in an adjusted run date of 11/4/88.[18]

waived his right to counsel is unrepresented at any stage in the proceeding, any delay caused thereby is excludable time).

**15.** Although the docket characterizes this as a joint request for a continuance, documents in the record reflect that it was actually a defense request which the Commonwealth did not contest. Therefore, the time was excludable. *Robinson, supra.*

**16.** *Commonwealth v. Morales,* 508 Pa. 51, 60–61, 494 A.2d 367, 371–72 (1985) (defendant is unavailable when he is standing trial in another matter). In actuality, any delay between March and September that was necessitated by appellant's unavailability due to his other trials is excludable. *Robinson, supra* at 386, 446 A.2d at 899. However, as it is unclear from the docket which continuances were necessitated by the general congestion of the court docket and which were necessitated by appellant's own busy court schedule, we will only exclude the time appellant was actually on trial.

**17.** *Morales, supra.*

**18.** *Robinson, supra.*

13. 10/11/88—Appellant filed a motion to dismiss under Rule 1100(g), which was denied on 10/18/88 (7 days excludable time), resulting in an adjusted run date of 11/11/88.[19]

14. 10/18/88—Trial commenced.

Jury selection began on October 18, 1988, more than three weeks before the adjusted run date.[20] Therefore, appellant was not entitled to a dismissal under Rule 1100.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant's remaining claims all raise allegations of ineffective assistance of counsel. When asserting ineffective assistance of counsel, appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) the particular course chosen by counsel did not have any reasonable basis designed to effectuate his client's interests; and (3) counsel's ineffectiveness prejudiced appellant. *Commonwealth v. Edmiston,* 535 Pa. 210, 237, 634 A.2d 1078, 1092 (1993), *citing, Commonwealth v. Pierce,* 515 Pa. 153, 158, 527 A.2d 973, 975 (1987). Counsel is presumed to have acted in his clients's best interest; thus, it is appellant's burden to prove otherwise. *Commonwealth v. Hancharik,* 534 Pa. 435, 633 A.2d 1074 (1993); *Commonwealth v. Miller,* 494 Pa. 229, 233, 431 A.2d 233, 235 (1981).

### A. *Suppression of Evidence*

Appellant first contends that trial counsel and post-verdict motions counsel were ineffective for failing to preserve the issue post-trial of whether the trial court erred by excluding testimony of four defense witnesses that the victim had told them that he owed money to his drug supplier (a man by the name of "Hodges").[21] Appellant argues the

---

**19.** *Chilcote, supra.*

**20.** Indeed, appellant continued to complain that he was not prepared to go to trial even after trial had begun. (N.T. 10/17/88 at 3–11, 10/31/88 at 629–33).

**21.** The proffered testimony consisted of the statements of four witnesses that the victim had told them he was indebted to his drug supplier.

trial court should have allowed this evidence because it would have supported his defense that someone else, possibly the drug supplier, had committed the crime.[22]

A trial court has broad discretion to determine whether evidence is admissible. *Miller, supra* at 551, 664 A.2d at 1320; *Commonwealth v. Cargo,* 498 Pa. 5, 15, 444 A.2d 639, 644 (1982). A trial court's ruling on an evidentiary issue will be reversed only if the court abuses its discretion. *Commonwealth v. Foy,* 531 Pa. 322, 326, 612 A.2d 1349, 1351 (1992). In the present case, the alleged four witnesses' testimony failed to demonstrate (1) that "Hodges" was owed money;[23] or (2) that any one particular person was owed money. Furthermore, several of the witnesses would have testified that the victim had told them he was paying back the debt, albeit to some unknown person rather than "Hodges." This proffered testimony, not supported by affidavits or a transcript of the alleged witnesses' actual testimony, only evidences that statements of the victim's indebtedness may have been made by the victim, that the victim was indebted to "someone," and

However, none of these witnesses had apparently specifically stated that the debt was owed to Hodges. N.T. 11/7/88 at 1138. Furthermore, the statements allegedly made by the victim were not consistent. Laura Luft would have testified that the victim told her he owed "someone" $2,500. *Id.* at 1145. Clifton Turner, III and Diane Willis would both have testified that the victim stated that the amount of the debt was $3,500. *Id.* Finally, Tobin Rice would have testified that the victim had stated that he was indebted for only $600. *Id.* Further, one or two of those witnesses would have testified that the deceased was making weekly payments on that debt. *Id.* at 1138.

22. Although trial counsel sought a ruling pre-trial to allow the testimony, trial counsel failed to challenge post-trial the court's ruling disallowing such evidence. Because the determination of guilt in appellant's case was before January 1, 1994, counsel's failure to raise an issue in post-verdict motions resulted in waiver.

Trial counsel identified the person in question as William Hodges at the hearing on this issue, but appellant identifies the alleged killer as Steven Hodges in his brief to this Court. As the post-trial testimony to which appellant refers in his discussion of this issue is that relating to William Hodges, we are assuming that they are the same person.

23. Not one of the alleged witnesses stated that the victim said he owed "Hodges" money. Rather, each of them apparently would have testified that the victim owed someone money, and each witness was aware of debts of different amounts and possibly to different persons.

that he was apparently in the process of repaying this someone or "someones." Moreover, the victim's own statements that he was repaying this debt fails to demonstrate why "someone" who was being paid back money owed would have a motive to kill the victim. Such speculative evidence has little or no probative value and was properly precluded. The trial court did not abuse its discretion in ruling that the proffered evidence lacked sufficiently probative value to be admissible.[24]

Furthermore, even if the evidence should have been admitted, appellant has failed to satisfy the prejudice prong necessary to support a claim of ineffectiveness. In order to show actual prejudice, appellant must demonstrate that the alleged ineffectiveness had an actual adverse effect on the proceedings. *Commonwealth v. Howard*, 538 Pa. 86, 99, 645 A.2d 1300, 1307 (1994). Given the overwhelming evidence against appellant, including the eyewitness testimony of two co-conspirators and the testimony of two other witnesses, including the mother of his children, that he had bragged about committing the murder, the omission of speculative testimony that the victim owed a debt which he was repaying was harmless error at most. Therefore, we find that such omission by trial counsel could not have an actual adverse effect on the proceedings.

### B. *Accomplice Testimony*

Appellant next alleges that trial counsel was ineffective for failing to request (1) a jury instruction that the testimony of one accomplice could not be used to corroborate the testimony of another accomplice and (2) an instruction that the accomplices' guilty pleas could not be considered during deliberations to infer appellant's guilt by association. Appel-

---

24. The court ruled that the evidence, although hearsay, came within the hearsay exception for statements against pecuniary interest. *See* McCormick, *Evidence* § 277 (3d ed. 1984) (a statement that the declarant is indebted is the clearest example of a statement against pecuniary interest). Although this Court has never addressed what is necessary for a statement of indebtedness to be so contrary to the declarant's pecuniary interest as to come with that hearsay exception, we will not do so now as such a discussion is not necessary to the resolution of this claim.

lant further contends that post-verdict counsel was ineffective for not raising these issues in post-verdict motions.

In support of his proposition that the testimony of one accomplice cannot be corroborated by that of another accomplice, appellant relies on *Commonwealth v. Bennett,* 220 Pa.Super. 378, 283 A.2d 724 (1971), and *Commonwealth v. Pressel,* 194 Pa.Super. 367, 168 A.2d 779 (1961), in which the Superior Court held that, where a defendant requests a jury instruction that the testimony of one accomplice can not be used to corroborate the testimony of another accomplice, it is reversible error to deny the request.[25] However, because appellant never requested such a charge, the question at issue is whether counsel's failure to request such an instruction prejudiced appellant.

█ Although appellant contends that he was prejudiced by trial counsel's failure to request a *Pressel* charge, he does not support that contention with anything more than language from *Pressel* that failure to give such an instruction when requested is not harmless error, essentially arguing that failure to give the instruction was *per se* reversible error. However, the absence of a jury instruction that would not pass muster under a harmless error analysis does not necessarily give rise to prejudice which would render trial counsel ineffective. *Howard, supra* at 100, 645 A.2d at 1308 (appellant failed to establish prejudice from trial counsel failure to request "no adverse inference" jury instruction, although failure to give such an instruction if requested would not have been harmless error).

In the present case, the trial judge instructed the jury at length on the possibility of bias arising from the testimony of appellant's accomplices. N.T. 11/1/88 at 1402–08, 1414–18. Furthermore, both Darcene Harmon and Anna Serrano, the mother of appellant's children, testified at trial that appellant bragged to them on several occasions about how he committed

---

**25.** This Court has never addressed the question of jury instructions regarding the use of the testimony of one accomplice to corroborate that of another accomplice. Because appellant has failed to establish that he was prejudiced by trial counsel's failure to request such a charge, we need not address that issue at this time.

the murders. Therefore, the testimony of the two accomplices was corroborated by appellant's own words. Even assuming *arguendo* that appellant was entitled to a *Pressel* charge, the court's extensive instruction on the weight to be given to the accomplices' testimony and the corroboration provided by appellant's own admissions to his participation in the crime negate appellant's claim of prejudice. Therefore, trial counsel was not ineffective for failure to request such a charge.

With respect to appellant's contention that trial counsel was ineffective for failing to request an instruction that the accomplices' guilty pleas could not be considered by the jury to find appellant "guilty by association," appellant disregards the fact that he was charged with *conspiracy* to commit the crimes with which he was charged. Once the jury accepts evidence which establishes that a conspiracy exists, the jury may infer appellant's guilt by the actions of his co-conspirators. *Commonwealth v. Scudder,* 490 Pa. 415, 419–20, 416 A.2d 1003, 1005 (1980) (an inference of guilt may be imputed to defendant if there is some evidence that the defendant concurred in the action taken; evidence of a conspiracy satisfies this requirement). Therefore, appellant was not entitled to an instruction that the jury could not infer his guilt based solely on his association with his co-conspirators.

As previously noted, appellant concedes in his brief that the trial court properly and extensively instructed the jury on how to weigh and evaluate the testimony of accomplices. Brief for Appellant at 33; N.T. 11/1/–88 at 1402–08, 1414–18. The trial court also instructed the jury on the possibility of bias arising from a plea bargain. *Id.* Because appellant was not entitled to the instruction he claims counsel should have requested and since the jury charge was proper, trial counsel was not ineffective. Because trial counsel was not ineffective, appellate counsel was not ineffective for failing to raise this claim in post-verdict motions. This claim is meritless.

### C. *Prosecutorial Misconduct in Penalty Phase*

Finally, appellant asserts that trial counsel was ineffective for failing to object to prosecutorial misconduct

during closing arguments in the penalty phase.[26] It is well established that a prosecutor's comments are not evidence and the court clearly instructed the jury on this rule of law. N.T. 11/16/88 at 1569. *Commonwealth v. LaCava*, 542 Pa. 160, 182, 666 A.2d 221, 231 (1995), *citing Commonwealth v. Green*, 525 Pa. 424, 461, 581 A.2d 544, 562 (1990). The jury is presumed to follow the court's instructions. *Commonwealth v. Steele*, 522 Pa. 61, 78, 559 A.2d 904, 913 (1989). Moreover, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and a hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination. *Commonwealth v. Simmons*, 541 Pa. 211, 246–47, 662 A.2d 621, 638 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996). With these standards in mind, we find that the complained-of comment did not warrant a mistrial.

■ Appellant contends that the prosecutor improperly invoked the Bible during closing arguments when he stated:

Possibly, there is one part of the Bible that [appellant] did not read, and that is that there are ten Commandments, and the fifth is, "Thou shalt not kill." Maybe in Bible study, he went from the fourth to the sixth and never read the fifth, because certainly, his studies of the Bible never stopped him one iota from doing these horrible and vicious things.... Well, understanding the Bible and living it are two different things, and I think you are patently aware that [appellant] did not understand the difference.

N.T. 11/16/88 at 1587.

The statement complained of by appellant was permissible comment to counter appellant's own injection of the Bible into

---

26. As this issue was not raised at any prior stage in the proceedings at which appellant was represented by new counsel, it is technically waived. Pa.R.A.P. 302(a). Nonetheless, we will address the issue under the relaxed waiver rule of *Zettlemoyer, supra* at 26, 454 A.2d at 942, so as to avoid future claims of ineffective assistance of appellate counsel.

the penalty phase through his own evidence and in his closing arguments in an attempt to portray himself as a religious, peaceful man beholden to the teachings of the Bible and unworthy of capital punishment despite his two previous murder convictions. Appellant presented testimony at the penalty phase that appellant, as a result of his involvement in Biblical studies in prison, no longer possessed the character of a killer and that therefore his life should be spared. Four "elders" of his prison church community testified on his behalf that appellant had "found religion" in prison and that they did not believe he was capable of killing again. His father also testified that appellant had been involved in religious studies for an extended period prior to the murders of Alvin Tyler and his two other murder victims. Moreover, defense counsel's summation focused in large part on appellant's religious character.

When considered in the context of the entire eighteen-page summation, the statements made by the prosecutor are permissible comment in response to the evidence presented. *Commonwealth v. Thompson*, 538 Pa. 297, 312, 648 A.2d 315, 322 (1994) (citations omitted). The challenged references to the Bible in the present case were made in the following context:

> [Appellant's father] testified that [appellant] was interested and sincere in Bible studies from the time he was a young man, that he continued on and seemed very sincere all that time up until he left the house. He went to Bible school, Bible studies, he talked about it in the house, and even after he left the house, he would discuss it with his mother. He discussed various things; Bible study and what not.
>
> Why is that important? It shows, for 18 to 20 years, the man's understanding of the Bible and his concept of the Bible inside his head, just as these ministers or elders told you that he has now. But, that did not stop him from committing three horrible, vicious crimes. The proof's in the pudding. As I said earlier, he can state that the Bible [sic] and read it all night long and he can recite it for you verse by verse, being very intelligent about his knowledge

of the Bible, but it's like those people that go out and rob, steal and cheat, and then go to church on Sunday, somehow it makes it all better. They are religious people, but I ask you, aren't those people that live the Bible and live by the concepts of the Bible far different from those just just [sic] reciting it and understanding it? From the time he was very young, he had knowledge and knew the concepts, but it is patently obvious that [appellant] did not live the Bible. It is easy to read and easy to understand it, but it is a lot more difficult to live it. He lived it in a horrible, gruesome way.

So, they want to tell you that after six, seven months of Bible study—he had it all his life—somehow changes this man whom they didn't even know him [sic]. Possibly, there is one part of the Bible that [appellant] did not read, and that is that there are ten Commandments, and the fifth is, "Thou shalt not kill." Maybe in Bible study, he went from the fourth to the sixth and never read the fifth, because certainly, his studies of the Bible never stopped him one iota from doing these horrible and vicious things. So, I ask you not even to accept that as a mitigating circumstance, the fact that somehow, after being convicted once in March, he now studies the Bible at Graterford when it never changed his character for 20 some odd years. He is now awaiting sentence after trial, and he is now understanding the Bible. Well, understanding the Bible and living it are two different things, and I think you are patently aware that [appellant] did not understand the difference.

N.T. 11/16/88 at 1858–57.

 Where the prosecutor merely argues matters in evidence, no new trial is warranted. *Commonwealth v. Lawson*, 519 Pa. 175, 190, 546 A.2d 589, 596 (1988). The prosecutor may properly comment on the evidence and is permitted to do so with reasonable oratorical flair. *Commonwealth v. Marshall*, 534 Pa. 488, 502, 633 A.2d 1100, 1107 (1993) (during the penalty hearing, the prosecutor is accorded reasonable latitude and may employ oratorical flair in arguing for a sentence of death). The prosecutor's comments here were logically related to testimony presented during the penalty

phase and were therefore permissible comments on the evidence presented during the penalty phase of the trial and were fair response to the evidence presented in mitigation by appellant.

Appellant argues however, that the statements were *per se* reversible error, citing the Court's decision in *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992). In *Chambers*, this Court stated that "reliance upon the Bible or any other religious writing in support of the imposition of the death penalty is reversible error *per se*." *Id.* at 568, 599 A.2d at 644.

At the outset, *Chambers* was not decided until three years after appellant's trial. Prior to *Chambers*, references to the Bible were characterized as "on the limits of oratorical flair" and were strongly cautioned against, but not forbidden. *Id.* Trial counsel cannot be deemed ineffective for failing to anticipate Court decisions which have yet to be handed down. *Commonwealth v. Fahy*, 537 Pa. 533, 541, 645 A.2d 199, 203 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995). Because these statements were admissible at the time of appellant's trial, trial counsel was not ineffective.

Nevertheless, such comments were a fair response to the evidence presented by the defense and did not violate the *per se* rule of *Chambers*. As discussed above, the challenged reference to the Bible, when placed in proper context, was intended only to show that appellant's character was not affected by his religious studies prior to appellant's three murders, and therefore the jury should not accept that his Bible studies in prison had dramatically changed his character. This is quite different from the situation in *Chambers*, where the prosecutor stated: "Karl Chambers has taken a life.... As the Bible says, 'and the murderer shall be put to death.'" *Id.* at 585, 599 A.2d at 643. The prosecutor in the present case did not rely on the Bible to support the death penalty, but made reference to it only to refute appellant's defense to the imposition of the death penalty based entirely on appel-

lant's alleged religious character and his alleged Biblical ties. Therefore, even if the *per se* rule of *Chambers* had been in effect at the time of appellant's conviction, under the circumstances at hand, trial counsel was not ineffective for failing to object to permissible comment on the evidence. Accordingly, a new sentencing hearing is not warranted.

## REVIEW OF SENTENCE

■ Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3). After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor, but rather was the product of a proper weighing of the jury's finding of three aggravating circumstances against no mitigating circumstances. In such circumstances, where there are no mitigating circumstances found and at least one aggravating circumstance found, as a matter of law, the sentence of death must be imposed. 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268 (1996) (where at least one aggravating circumstance found by the jury is supported by sufficient evidence and no mitigating circumstances are found by the jury, the death sentence is proper). Hence, appellant failed to prove his sentence was the product of the first factor under 42 Pa.C.S. § 9711(h)(3).

■ With respect to the second factor under 42 Pa.C.S. § 9711(h)(3), the evidence amply supports the finding of three aggravating circumstances specified in 42 Pa.C.S. § 9711(d).

The first aggravating circumstance found by the jury was that appellant committed the killing while in the perpetration of a felony (robbery), 42 Pa.C.S. § 9711(d)(6). The evidence at trial established that appellant murdered the victim as part of a plan to steal a VCR, drugs and money from his home. Therefore, this aggravating circumstance was supported by sufficient evidence. 18 Pa.C.S. § 3701(a).

The jury also found two aggravating circumstances under 42 Pa.C.S. § 9711(d)(10), that appellant had been convicted of two other Federal or State offenses committed either before or at the time of the offense at issue, for which sentences of life imprisonment or death were imposable, or appellant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense. Evidence was presented that appellant had been convicted of first degree murder on March 4, 1988, for the November 22, 1985 murder of Stanley Williams, and convicted on September 23, 1988, of first degree murder for the November 26, 1986 murder of Israel Nuremberg. Thus, the evidence supported each of these aggravating circumstances. Indeed, appellant does not challenge these findings.

With respect to the final factor we must consider under 42 Pa.C.S. § 9711(h)(3), in accordance with *Zettlemoyer,* *supra* at 63, 454 A.2d at 961, we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts (AOPC) pertaining to similar death penalty cases and conducted our own research and have concluded that the sentence of death imposed upon appellant is not excessive or disproportionate to the sentences imposed in similar cases. See *Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Indeed, in cases in which such aggravating circumstances and no mitigating circumstances were found, the death penalty has been imposed in virtually every instance in accordance with 42 Pa.C.S. § 9711(c)(1)(iv). *Commonwealth v. Hill,* 542 Pa. 291, 666 A.2d 642 (1995) (three aggravating circumstances and no mitigating circumstances); *Simmons,* *supra* (three aggravating circumstances and no mitigating

circumstances); *Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308 (1995) (three aggravating circumstances and no mitigating circumstances).

Accordingly, we affirm the verdict of guilt and the sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[27]

FLAHERTY, J., did not participate in the consideration or decision of this case.

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

---

27. Within ninety days of the date the sentence of death is upheld by this Court, the Prothonotary of this Court is directed to transmit to the Governor's office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).