846 A.2d 75

COMMONWEALTH of Pennsylvania, Appellee

v.

Timothy BOCZKOWSKI, Appellant.

Supreme Court of Pennsylvania.

Argued March 4, 2002.

Decided March 23, 2004.

430

James M. Herb, Pittsburgh, for Timothy Boczkowski, Appellant.

Karen T. Edwards, Edward Borkowski, Pittsburgh, Amy Zapp, Harrisburg, for the Com., Appellee.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

### OPINION OF THE COURT

Justice CASTILLE.

On May 5, 1999, a jury sitting before the Honorable David S. Cercone of the Court of Common Pleas of Allegheny County convicted appellant of first-degree murder for the strangulation death of his wife, Maryann Boczkowski.[1] At the penalty hearing, the jury found one aggravating circumstance—that appellant had been convicted of another murder committed before or at the time of the offense at issue[2]—and one mitigating circumstance—evidence of mitigation concerning appellant's character.[3] The jury found that the aggravating circumstance outweighed the mitigating circumstance and therefore returned a sentence of death.[4] On May 6, 1999, the trial court formally imposed the death sentence. In this direct appeal from the sentence of death, appellant specifies twenty claims of error. For the reasons that follow, we affirm the verdict of guilt, but vacate the sentence of death and remand for imposition of a sentence of life imprisonment.

### I. *Sufficiency of the Evidence* [5]

In all direct capital appeals, this Court performs a self-imposed duty to review the sufficiency of the evidence in support of the first-degree murder verdict. *E.g. Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 840 (2003). In addition, appellant specifically challenges the sufficiency of the evidence, arguing that the Commonwealth failed to prove that Maryann Boczkowski's death was a homicide, rather than an accident. In reviewing the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial and all reasonable inferences derived therefrom, when viewed

1. 18 Pa.C.S. § 2502(a).
2. 42 Pa.C.S. § 9711(d)(11).
3. 42 Pa.C.S. § 9711(e)(8).
4. 42 Pa.C.S. § 9711(c)(1)(iv).
5. We have reorganized appellant's claims for purposes of clarity.

in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding of all elements of the offense beyond a reasonable doubt. *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280 (2000) (citing *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986)). "Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing and that the killing was done with premeditation or deliberation." *Spotz,* 759 A.2d at 1283 (citing 18 Pa.C.S. § 2502(d) and *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624 (1991)).

■ Our independent review of the evidence reveals that, on November 7, 1994, appellant summoned paramedics and police to his home in Ross Township, Pennsylvania. The first police officer to arrive at the scene found appellant attempting to revive his thirty-six-year-old wife, Maryann Boczkowski, who was unconscious in the couple's hot tub. Appellant, police officers and paramedics removed Maryann from the hot tub and attempted to revive her, but they were unsuccessful. Maryann was transported to Allegheny General Hospital at appellant's request, rather than to the closest hospital. There, she was pronounced dead. An autopsy revealed that Maryann's death was caused by asphyxiation, resulting from blunt force trauma to her neck. The autopsy also showed numerous points of trauma of recent origin on Maryann's body and head, including hemorrhages on her neck and bruises on the interior of her scalp, which were inconsistent with the treatment she received in the attempts to revive her. Maryann's blood alcohol level at the time of her death was .22 percent.

Meanwhile, a physical examination of appellant revealed fresh scratch marks on his arms, sides and hands. In addition, before Maryann was taken to Allegheny General Hospital, appellant spontaneously told police: "I hope they don't try to put this on me." Later, after voluntarily accompanying police to the Ross Township Police Department, appellant nodded in the affirmative when officers asserted that he had been involved in his wife's death.

Trial testimony also established that in the months preceding Maryann's death, appellant had attempted to portray her to friends as an alcoholic. Maryann's longtime friends, however, testified that they rarely saw Maryann intoxicated. In addition, appellant stipulated that he was the beneficiary of a $100,000 life insurance policy on Maryann's life. Appellant also made incriminating statements to fellow inmates at the Allegheny County Jail, admitting his culpability for the deaths of both Maryann and his previous wife, Elaine, and responding to an inmate query regarding why he had killed both wives in the same manner with, "I don't know. That was stupid, wasn't it."

Independent trial evidence established that appellant's former wife, Elaine Boczkowski, had been found dead in her bathtub in Greensboro, North Carolina, on November 4, 1990. The factual circumstances of that death bore a marked similarity to the circumstances surrounding Maryann's death: Elaine died in her bathtub, Maryann in a hot tub. Both women were in their thirties and in good health. Appellant reported to the North Carolina police that Elaine had been drinking alcoholic beverages before entering the bathtub; he told Ross Township police that Maryann had been drinking prior to entering the hot tub. Appellant told police in both jurisdictions that he and his wife had a minor argument on the evening before the death. In each case, police noticed that appellant had fresh scratch marks on his arms, hands and torso shortly after his wife's death. The autopsies of both women revealed that they had died from asphyxiation, not drowning.

The foregoing evidence adequately supports the jury's finding that Maryann Boczkowski was unlawfully killed, that appellant, who was found with her, killed her, that he acted with the specific intent to kill when he applied blunt force to Maryann's neck, and that the killing was done with premeditation and deliberation.

Turning to appellant's specific sufficiency claim, he argues that the evidence was insufficient to prove that Maryann Boczkowski's death resulted from a homicide rather than an

accident. In support of this claim, appellant points to the testimony of both the Commonwealth's pathologist, who performed the autopsy on Maryann, and the defense pathologist. Their findings, appellant argues, are more consistent with accidental drowning than manual strangulation. Appellant suggests that the Commonwealth's pathologist vacillated in his testimony regarding the cause of Maryann's death. The record does not support his argument. The Commonwealth's pathologist testified consistently that the cause of death was manual strangulation. Although appellant's own pathologist testified that the cause of death was drowning, this is of no avail on a sufficiency claim: appellant's argument is fatally flawed because it rests only on the evidence submitted by the defense, evidence which the jury was not obligated to accept. *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 527 (2003).

## II. *Claims of Pre Trial Error*

Appellant raises eight claims of pre-trial error: one claim that his rights under former Pa.R.Crim.P. 1100 were violated; four claims involving his motion *in limine* seeking to limit the introduction of evidence regarding the murder of his former wife in North Carolina; and three claims of error on the part of the suppression court.

Appellant first claims that the trial court erred in denying his motion to dismiss the charges against him under former Rule 1100.[6] In reviewing the Rule 1100 determination of the trial court, we "must view the facts in the light most favorable to the prevailing party" and we will not disturb the decision below absent an abuse of discretion. *Commonwealth v. Hill*, 558 Pa. 238, 736 A.2d 578, 581 (1999). Pursuant to the Rule and this Court's holding in *Hill*, a capital defendant must be brought to trial within 365 non-excludable days of the filing of a complaint against him. *Id.* at 584. *See also Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639, 645 n. 11 (1996); *Common-*

---

6. Rule 1100 has since been renumbered Rule 600. Because the Rule 1100 enumeration was in effect at the times pertinent to this appeal, we will refer to the applicable rule as Rule 1100.

*wealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1181 n. 4 (1993). "The term excludable time derives from Rule 1100(c) and refers to any period of time which is excludable from the calculation of determining whether a Rule 1100 violation has occurred." *Hill,* 736 A.2d at 584. Rule 1100(c) mandated as follows:

(c) In determining the period for commencement of trial, there shall be excluded therefrom:

(1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;

(2) any period of time for which the defendant expressly waives Rule 1100;

(3) such period of delay at any stage of the proceedings as results from:

(i) the unavailability of the defendant or the defendant's attorney;

(ii) any continuance granted at the request of the defendant or the defendant's attorney.

We find no abuse of discretion in the trial court's ruling.

■ The complaint charging appellant with his wife's murder was filed on November 14, 1994, and his jury trial commenced on April 5, 1999, 1,603 days later. From that time period, appellant concedes that it is appropriate to exclude: (1) the 966 days from October 5, 1995 through May 27, 1999, during which the Commonwealth's pre-trial appeal of the trial court's ruling on appellant's motion *in limine* was litigated (this 966 days includes the period during which appellant's petition for allowance of appeal was pending in this Court following the Superior Court's ruling in the Commonwealth's favor); [7] and (2) the 63 days between February 1, 1999 and the date trial ultimately commenced, April 5, 1999, because appel-

---

7. It is settled that " '[e]xcusable delay' for purposes of Rule 1100 review includes delay caused by appellate review of pretrial motions." *Commonwealth v. DeBlase,* 542 Pa. 22, 665 A.2d 427, 431–32 (1995) (collecting cases).

lant had requested that the February 1 trial date be rescheduled.[8] Excluding these two periods leaves 574 days between the filing of the complaint and the commencement of appellant's trial.

Appellant takes issue with the trial court's exclusion of two other large blocks of time: (1) the 147 days from May 1, 1995 to September 25, 1995, occasioned by a defense request for a postponement; and (2) the 148 days from May 27, 1998, when this Court denied his allocatur petition following the Commonwealth's successful pre-trial appeal, and October 22, 1998, when appellant was returned from North Carolina to Pennsylvania for trial.

As to the first period, appellant argues that the trial court erred in excluding this period from the Rule 1100 calculation because it was the Commonwealth's lack of due diligence in providing him with discovery which occasioned his postponement request. Invoking Rule 1100(c)(2), the Commonwealth counters by noting that, on April 10, 1995, the same date that appellant requested the continuance, he explicitly waived his Rule 1100 rights both in a record colloquy[9] and a written colloquy.[10] Both waiver colloquies noted that the next trial listing was September 25, 1995. Moreover, the written waiver explicitly noted that this time was excludable time under Rule 1100. Appellant inexplicably does not acknowledge the existence of the explicit waivers, much less does he argue that the waivers were deficient in some fashion. Under the plain language of Rule 1100(c)(2), this time is excludable.[11] Subtracting this 147 day excludable period from the Rule 100 calculation leaves 427 days.

8. Appellant miscalculates this period as comprising only 62 days.

9. *See* N.T. 10/10/95 "Rule 1100 Waiver" at 2–6.

10. The written colloquy is included in the certified record on appeal. *See* D–14.

11. Moreover, as the trial court noted, appellant's attempt to avoid the consequences of his explicit Rule 1100 waiver on the ground that the Commonwealth failed in its discovery obligations was disingenuous in that he could have asked for other relief, such as the exclusion of witnesses or evidence, rather than waiving his Rule 1100 rights. *See* N.T. Motions Hearing, 4/4/99, at 21–22.

Turning to the second disputed period, by the time this Court entered its order on May 27, 1998 denying appellant's allocatur petition following the Superior Court's ruling on the Commonwealth's appeal of the motion *in limine,* appellant had been tried, convicted, and sentenced to life imprisonment in North Carolina for the 1990 murder of his first wife. On August 3, 1998, the Commonwealth requested temporary custody of appellant from North Carolina authorities pursuant to the Interstate Agreement on Detainers (IAD), 42 Pa.C.S. § 9101 *et seq.,* in order to try him for the murder *sub judice.* Appellant, however, refused to sign the waiver which would have permitted his immediate return for trial pursuant to the IAD. Appellant eventually failed in his attempts to prevent the transfer in the North Carolina trial and appellate courts and he was ultimately returned to the Commonwealth on October 22, 1998. Appellant does not dispute that he was unavailable for trial in Pennsylvania during this period because he was incarcerated in North Carolina. Appellant nevertheless argues that this time should not be deemed excludable for Rule 1100 purposes because his initial 1995 transfer to North Carolina for trial there was achieved by the Commonwealth in violation of a pending Pennsylvania court order which had stayed extradition to North Carolina pending disposition of the Pennsylvania murder charge.

The Commonwealth responds that the 148 day delay in appellant's return to Pennsylvania was occasioned solely by his refusal to sign an IAD waiver [12] and his concomitant decision to fight his return to Pennsylvania in the North Carolina court system.[13] The Commonwealth notes that it acted diligently in attempting to secure appellant's return and, thus, this period of appellant's unavailability was properly excluded under the plain terms of Rule 1100(c)(3)(i). With

12. Because appellant had been tried, convicted and sentenced in North Carolina for the murder of his former wife, the IAD provided the only means for the Commonwealth to secure appellant's return to Pennsylvania.

13. We note that the Comment to Rule 1100 provided that, for purposes of Rule 1100(c)(3)(i), "the defendant should be deemed unavailable for the period of time during which the defendant contested extradition."

respect to appellant's claim that it secured his 1995 transfer to North Carolina in violation of the pending extradition order, the Commonwealth notes that the extradition circumstances changed dramatically once it took its pre-trial appeal of the ruling on appellant's motion *in limine,* since that appeal could possibly take years to resolve, and that its acquiescence in the transfer request made by North Carolina authorities ensured that the delay occasioned by its appeal would not impede appellant's right to a speedy trial in North Carolina. The Commonwealth deems it notable in this regard that appellant did not object at the time of his transfer to North Carolina, nor does he now suggest that there was a valid argument by which he could have successfully opposed extradition once the pre-trial appeal was taken. In light of all of these circumstances, the Commonwealth argues, the sanction of dismissal requested by appellant would be unreasonable.

Although we will discuss the Commonwealth's alleged violation of the initial extradition order in resolving appellant's penalty phase claim concerning the aggravating circumstance in this case, we need not address it to resolve the Rule 1100 issue. This is so because exclusion of this 148–day period is not necessary to determine that trial was held within the 365 days afforded under Rule 1100. As the Commonwealth accurately notes, appellant executed a second explicit, written waiver on November 23, 1998, waiving his Rule 1100 rights from that date until "April 5, 1999 + 60 days." [14] Thus, it is not simply the 63–day period from February 1, 1999 to April 5, 1999 which was excludable after appellant was returned from North Carolina, but also the 70–day period from November 23, 1998 to February 1, 1999, as well. Once again, appellant inexplicably does not acknowledge the existence of this waiver, much less does he explain why it does not result in

14. *See* D–43, at 4. *See also* N.T. 11/23/98, "Rule 1100 waiver," 2–8. This waiver also encompassed a waiver of appellant's right to be tried within 120 days of his return to Pennsylvania pursuant to the Interstate Agreement on Detainers. During the oral colloquy, appellant's counsel noted that one reason for the waiver was that counsel needed more time to prepare since, in light of the North Carolina conviction, appellant's trial here was now a capital proceeding.

excludable time under Rule 1100(c)(2). Thus, even if it is assumed that the 148–day period during which appellant remained in North Carolina is not excludable in calculating the Rule 1100 run date, it is apparent that appellant was brought to trial within 357 non-excludable days (427 minus 70), which is well within the 365 day period mandated by Rule 1100. Thus, appellant's Rule 1100 claim fails.[15]

Appellant's next four claims of error involve challenges to the Superior Court's decision concerning the Commonwealth's pre-trial appeal. That appeal was from the trial court's October 4, 1995 order granting in part appellant's motion in limine and barring the Commonwealth from introducing any evidence concerning appellant's marriage to Elaine Boczkowski, her death in 1990, and appellant's arrest in 1994 for her death, except to the extent the Commonwealth sought to introduce the evidence "to rebut [appellant's] claim or any other evidence that the death of Mary Ann Boczkowski was the result of accident." The Commonwealth argued on appeal that the evidence concerning Elaine Boczkowski was admissible in its case-in-chief to prove that Maryann's death was not an accident, but was, in fact, a murder.

A divided panel of the Superior Court issued a memorandum opinion affirming in part and reversing in part. The panel majority noted the settled rule that relevant evidence of prior bad acts is inadmissible to show bad character or criminal propensity, but is admissible if offered for another relevant purpose and if the probative need for the evidence outweighs its potential prejudicial effect. *See, e.g., Commonwealth v. Richter,* 551 Pa. 507, 711 A.2d 464, 466 (1998). Citing the decision in *Commonwealth v. Donahue,* 519 Pa. 532, 549 A.2d 121, 127 (1988) (Opinion Announcing Judgment of Court), the majority agreed with the trial court that this evidence fell within the well-recognized "absence of accident" exception to the general proscription against the introduction

---

**15.** It seems appropriate at this time to remind counsel of the appropriate professional conduct required by the Rules of Professional Conduct. *See* Rule 3.2 ("Candor Toward the Tribunal"). Counsel should not ignore material facts or evidence that contradict or undermine a proffered theory or legal argument.

of prior bad acts evidence. The majority found that "the manner and circumstances surrounding the two deaths were remarkably similar," therefore the evidence was "highly probative" of whether appellant killed Maryann, and the probative value of the evidence outweighed its potential for unfair prejudice. Accordingly, the majority concluded that the trial court had erred to the extent it barred the evidence from the Commonwealth's case-in-chief: "the Commonwealth should not have to wait to rebut a **possible** claim that Maryann's death was accidental." Mem. op. at 4–7 (emphasis original). Judge Johnson dissented, opining that the prejudicial impact of the evidence outweighed its probative value, unless appellant first raised the issue of accident.

Appellant filed a petition for allowance of appeal to this Court claiming that the Superior Court erred in: (1) ruling on the Commonwealth's interlocutory appeal without first determining the validity of the Commonwealth's certification that the trial court motion in limine terminated or substantially handicapped the prosecution; and (2) reversing the trial court's determination that evidence regarding Elaine's death was admissible only in rebuttal. This Court denied allocatur on February 25, 1998 and denied reconsideration on May 27, 1998.

Appellant's first assignment of error concerning the pre-trial appeal echoes his complaint on allocatur that the Superior Court erred in failing to determine the validity of the Commonwealth's certification that the grant of appellant's motion in limine terminated or substantially handicapped the prosecution.[16] Appellant claims that mere certification by the

16. The Commonwealth argues that some (though curiously not all) of appellant's claims concerning the Superior Court's disposition of the pre-trial appeal are barred under the law of the case doctrine because this Court's denial of his petition for allowance of appeal was a final decision on the merits. Had we granted discretionary review and actually passed on the merits of the claims, the Commonwealth's argument might be persuasive. However, a decision declining to review the decision of an intermediate appellate court cannot be equated with a decision on the merits. *See Commonwealth v. Ogrod*, 839 A.2d 294, 317 (Pa.2003). Indeed, not having exercised jurisdiction over the appeal, we cannot have passed upon its merits. In contrast to this

Commonwealth that a pre-trial order terminates or substantially handicaps the prosecution is not sufficient to trigger the right to appeal orders granting defense motions in limine. Superior Court committed no error.

Pa.R.A.P. 311(d) provides that:

In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

The classic case of an interlocutory order appealable by the Commonwealth as of right by such certification is one granting a defense motion to suppress evidence. *E.g., Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382, 386 (1985). The certification by an officer of the Court guards against frivolous appeals or appeals intended solely for delay. *Id.* This Court has held that the Commonwealth's certification is "not contestable" and "in and of itself, precipitates and authorizes the appeal." *Id. See also Commonwealth v. Matis,* 551 Pa. 220, 710 A.2d 12, 17 (1998) (same).[17] This Court has since made clear that the Commonwealth may appeal a pre-trial ruling on a motion in limine which excludes Commonwealth evidence in the same manner that it may appeal an adverse ruling on a suppression motion—*i.e.,* by certification that the order has the effect of terminating or substantially handicapping the prosecution. *Matis, supra; Commonwealth v. Gordon,* 543 Pa. 513, 673 A.2d 866 (1996); *Commonwealth v. Cohen,* 529 Pa. 552, 605 A.2d 1212 (1992) (plurality opinion).

In the case *sub judice,* the Commonwealth included in its notice of appeal a good faith certification that the trial court order excluding evidence of Elaine Boczkowski's murder from

Court's discretionary docket, cases arising on our capital appeal docket involve direct review, in which we are obliged to consider properly preserved and presented claims, such as those now forwarded by appellant. Accordingly, we proceed to the merits. *Id.*

17. The *Dugger* Court also noted that this Court had defined "substantial handicap" as existing whenever the Commonwealth is denied the use of *all* [its] evidence. 486 A.2d at 386 (emphasis original). *See, also, Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304, 308 (1963) (same).

its case-in-chief terminated or substantially handicapped the prosecution. That certification was sufficient to trigger the Commonwealth's right to appeal. The Superior Court panel properly recognized that it was not authorized to go behind that certification. *Dugger*, 486 A.2d at 385.

Appellant next claims that the Superior Court panel majority erred in considering a matter not of record in ruling upon the admissibility of the other crimes evidence—specifically, the fact that by the time of the Superior Court's decision appellant had been tried and convicted of Elaine Boczkowski's murder in North Carolina. The Superior Court merely mentioned the fact of the conviction—a fact whose accuracy appellant does not dispute—in a footnote appended to its quotation of the trial court's in limine ruling. The fact of the conviction itself was not cited by the panel as playing any role in its admissibility analysis. Moreover, even if it is assumed that the Superior Court should not have adverted to the fact, appellant's procedural objection ultimately merges into his substantive claim which we address immediately below, *i.e.,* that the evidence of the fact and circumstances of Elaine Boczkowski's murder should have been deemed inadmissible in the Commonwealth's case-in-chief. Because we reject that claim on the merits, this derivative objection necessarily fails.

Turning to that substantive claim, appellant concedes that evidence of prior bad acts is admissible to prove absence of mistake or accident. He argues, however, that a defense of accident must first be raised before the evidence may be introduced, *i.e.,* he suggests that such evidence is a matter for rebuttal only. Appellant goes so far as to suggest that in the absence of "a positive claim by the defense that accident, not homicide, was the underlying cause of death," proof tending to show absence of accident is irrelevant. Appellant further notes that the Commonwealth should not be permitted to " 'credit the accused with fancy defenses in order to rebut them' " with prejudicial evidence. Appellant's Brief, 36 (quoting *McCormick on Evidence* (2d ed.), § 190 n. 54). The Commonwealth responds by noting that, in order to convict appellant of first degree murder, it is required to prove

beyond a reasonable doubt, among other things, that appellant killed Maryann and that he acted with specific intent. There were no eyewitnesses (other than appellant himself) and, although appellant made some incriminating statements and head movements that were interpreted as incriminatory, he did not give a detailed confession. Thus, the case against appellant was largely circumstantial: *i.e.,* consisting of proof that death was brought on by blunt force trauma and asphyxiation, not drowning; the fact that appellant was the only person with access, *etc.* The Commonwealth argues that proof of the circumstances surrounding the death of appellant's first wife was highly probative in that it too tended to show that Maryann died at someone's hands, and not by some other means, and that those hands belonged to appellant. In addition to ruling out accident as the cause of death, the Commonwealth argues, the evidence was also probative of appellant's intent. The Commonwealth also notes that the prospect of prejudice arising from the evidence was ameliorated by the trial court's repeated and explicit instructions to the jury as to the limited purpose of the evidence.

 Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact, *Tharp,* 830 A.2d at 530 (citing *Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110, 117 (2001))— and its probative value outweighs the likelihood of unfair prejudice. As noted above, evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect. *Richter; see also Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1152 (2000), *cert. denied,* 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001). This Court has recognized many relevant purposes, other than criminal propensity, for which evidence of other crimes may be introduced, including to show the absence of accident. *E.g., Spotz.*

The parties have cited to no cases, and our research has revealed none, which speak directly to whether evidence of an absence of accident must or should be presented only as responsive evidence to a specifically-forwarded defense of accident. At least for purposes of a homicide prosecution, where the victim, of course, is unavailable, we reject the notion that proof of an absence of accident is admissible only for responsive purposes. Although death itself occurs in innumerable ways, there are but a limited number of manners of death: suicide, natural causes, accident, homicide or, in rare instances, indeterminable. In a murder prosecution, the Commonwealth bears the affirmative burden of convincing the jury beyond a reasonable doubt that the death was only by homicide; and, in a first-degree murder case, it bears the additional burden of proving that the defendant acted with premeditation and/or deliberation. The defendant, of course, is not obliged to present any evidence at all. In a case such as this, where there are no Commonwealth eyewitnesses, one appropriate way in which to prove that the death was by criminal means is to exclude the possibility of other manners of death. This is not the rebuttal of a prospective "fancy defense" contemplated in appellant's quote from McCormick but one which, if not excluded, may go to the very heart of the Commonwealth's burden in a murder prosecution.

Moreover, the defendant does not have to actually forward a formal defense of accident, or even present an argument along those lines, before the Commonwealth may have a practical need to exclude the theory of accidental death. This case provides a practical example. Certain of the evidence available to the Commonwealth here was suggestive that Maryann's death could have been accidental, even if appellant did not affirmatively argue that inference. Illustrative are the facts that appellant told paramedics at the scene that on the night she died Maryann had consumed fourteen beers; that he and Maryann had been celebrating an upcoming event; that he had left her in the hot tub while he went to take a shower; and that, upon returning, he found her unconscious and face up in the hot tub. This account clearly suggested an acciden-

tal death and it was certainly relevant for the Commonwealth to prove both the existence of the account and then to demonstrate its implausibility—since the very implausibility of the account by the person in the best position to know how the victim died was probative of guilt. Even if appellant did not intend to affirmatively argue this evidence or to explicitly forward a defense of accident, it was still a matter the jury might consider, and the Commonwealth properly could eliminate that consideration. Nor should the Commonwealth be forced to dilute the evidence available to it by being deprived of the ability to prove the implausibility of appellant's explanation by relevant evidence tending to show the absence of accident.

Given the remarkable similarity between the manner in which both of appellant's wives were killed, evidence concerning the circumstances of Elaine's death supported a reasonable inference that Maryann's death was not accidental, but rather, was a result of appellant's deliberate act. We agree with the Superior Court that the evidence was highly relevant and that its probative value outweighed any potential for unfair prejudice. As to the last point, we note that the trial court repeatedly and clearly charged the jury that the evidence was admitted for the limited purpose of excluding accident as the manner of death, and could not be considered for any other purpose. *Spotz*, 756 A.2d at 1153 (fact that trial court clearly instructed jury that it could only consider other crimes evidence for relevant limited purposes and not merely as evidence of appellant's propensity to commit crimes weighed against claim of error). Accordingly, this claim fails.

Appellant's final claim arising out of the pre-trial appeal is that the Superior Court erred in supposedly creating a *per se* exception to the general proscription against the admission of prior bad acts. The unpublished Superior Court decision below creates no such *per se* exception. The Superior Court did not innovate some new rule of evidence: Absence of accident is a recognized exception to the proscription appellant invokes. Because we have determined that the evidence at

issue was properly admitted in the Commonwealth's case-in-chief in this matter, this claim fails.

 Appellant next raises three claims relating to the trial court's denial of his motion to suppress evidence. Because the Commonwealth prevailed in the suppression court, we may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003) (citing *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 268 (2000) and *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 197 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998)).

 Appellant first argues that the trial court erred by refusing to suppress the fruits of the police questioning of him on November 7, 1994, because he was interrogated during a custodial detention which was unsupported by probable cause.[18] Appellant alleges that Ross Township detectives transported him to the Ross Township Police Station and kept him in a room in the basement from 4:20 a.m. until 11:30 p.m. without affording him a "specific option" to leave; during that time, he was photographed, a polygraph examination was arranged, and he was interviewed by detectives; and he claims he had no opportunity to sleep either before he was transported or while he was at the police station. Appellant argues that these circumstances gave rise to a reasonable belief that he was being detained and that detectives lacked probable cause to detain him because the autopsy on Maryann Boczkowski had not yet been completed. Because the detention was illegal, appellant argues, the trial court should have suppressed the evidence acquired as a result of the detention.

---

**18.** Although appellant invokes both the U.S. and Pennsylvania Constitutions in connection with this claim, he does not argue that a different test obtains under the Pennsylvania Constitution than under the Federal charter. Accordingly, we will employ a unitary approach.

The Commonwealth responds that the suppression record plainly demonstrates, and the trial court properly found, that appellant was not in custody at the time he was questioned at the station house and, thus, the motion to suppress was properly denied. We agree.

A person is in custody for *Miranda*[19] purposes only when he "is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Commonwealth v. Johnson,* 556 Pa. 216, 727 A.2d 1089, 1100 (1999) (citation omitted). The U.S. Supreme Court has elaborated that, in determining whether an individual was in custody, the "ultimate inquiry is ... whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) (citations omitted). The question of custody is an objective one, focusing on the totality of the circumstance, with due consideration given to the reasonable impression conveyed upon the person being questioned. *Commonwealth v. Gwynn,* 555 Pa. 86, 723 A.2d 143, 148 (1998), *cert. denied,* 528 U.S. 969, 120 S.Ct. 410, 145 L.Ed.2d 320 (1999).

The suppression record reveals that Detective Gary Waters, the first detective responding to the scene, arrived at appellant's house at approximately 3:00 a.m. on November 7, 1994 and had a brief conversation with appellant, during which he noticed a scratch mark on appellant's neck. At approximately 3:45 a.m., Detectives Waters and James Cvetic spoke to appellant and noted that he had a small injury on his left thumb. After a further brief conversation, the detectives asked appellant if he would accompany them to the police station so that his sleeping children would not be disturbed. Appellant readily agreed, expressing his desire to cooperate in any way and agreeing to give to the detectives the clothes he had been wearing earlier that evening. Although appellant

**19.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

was transported to the police station in a police vehicle, he was not handcuffed or restrained in any way.

Appellant and the detectives arrived at the police station at 4:20 a.m. and appellant was interviewed until approximately 5:45 a.m. in Detective Waters' basement office. Appellant was at all times alert and responsive to the officers' questions. At 5:30 a.m., appellant signed a consent form allowing police to photograph the scratches on his body, take fingernail scrapings, and obtain items found in or near the hot tub. Appellant also agreed to submit to a polygraph examination. During this entire time, appellant was free to move around the police station and was told that he was free to leave at any time. Between approximately 6:00 a.m., when the polygraph examiner was contacted, and 8:15 a.m., when the examiner arrived at the police station, appellant ate breakfast with the officers while discussing football, his children and other topics. Appellant never expressed that he was tired or that he wished to go home. He did request permission to contact his father to inquire about his children, and that request was accommodated.

When the polygraph examiner, Trooper Richard Ealing, arrived at the station, he explained the process to appellant and advised him of his *Miranda* rights. Appellant signed a form explicitly waiving those rights and was subjected to a polygraph examination. During the examination, Trooper Ealing repeatedly told appellant that he was free to leave and could not be forced to take the examination. The examination was completed at 10:15 a.m., at which time Trooper Ealing informed appellant that he had failed. The trooper expressed his belief that appellant was responsible for his wife's death, and appellant nodded in the affirmative. Appellant stated, "This is pretty serious; maybe I should call someone," but he neither identified whom he might wish to call nor did he pursue that issue.

Trooper Ealing informed the detectives that appellant had failed the polygraph examination, at which time appellant was again reminded of his *Miranda* rights, which he did not exercise. Again, appellant nodded in the affirmative when

Detective Waters stated a belief that appellant was responsible for Maryann's death. When all three officers confronted appellant with their belief that he had caused Maryann's death, he again nodded in agreement. Appellant then told the officers that he would tell them what happened in the presence of his attorney, James Herb, Esquire. All questioning ceased, and the officers made several attempts to contact Attorney Herb.

At 11:30 a.m., appellant was transported, without use of any restraints, to police headquarters for fingernail scrapings and a physical examination of his scratch marks. At noon, appellant signed a consent to search his clothing and body and he cooperated with the physician who took fingernail scrapings and examined the scratch marks. Attorney Herb arrived at police headquarters at approximately 2:00 p.m. and met with appellant alone for approximately one hour. Following that private meeting, Detective Cvetic again advised appellant of his *Miranda* rights, this time in the presence of Attorney Herb. Appellant elected to make no further statements and left police headquarters at 3:30 p.m. in the company of Attorney Herb.

On this record, the trial court found that appellant voluntarily accompanied police to the station house and that, while he certainly was questioned by police, such circumstances did not constitute custodial interrogation since he was free to leave at all times. That reality was reinforced by the fact that questioning ceased when appellant eventually invoked his right to have counsel present as well as the fact that, after counsel arrived and appellant consulted with him, he left in the company of counsel and was not arrested until some time later. In addition, the trial court stressed that, in any event, appellant was properly warned of his rights, he voluntarily waived those rights and spoke with police, and when he finally invoked those rights they were honored by police. The record fully supports the trial court's legal conclusions respecting the lack of custody, the *Miranda* waiver, and police respect for appellant's rights once invoked. Hence, this suppression claim fails.

450 

Appellant's second claim of suppression court error is that the court erred in denying suppression of his affirmative nods which, he claims, occurred during custodial interrogation and more than six hours after his arrest, in violation of the so-called *"Davenport/Duncan"* rule.[20] Having already found that appellant was not in police custody for purposes of suppression of evidence during this time period, we find no merit to this claim.[21]

 Finally, appellant claims that the suppression court erred by denying his motion to suppress the affirmative nods he made in response to questioning that occurred during custodial interrogation, and after he had invoked his right to counsel. Appellant cites *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), a case which indeed involved custodial interrogation. Appellant argues that when he initially agreed to accompany police officers to the station house in the early morning hours of November 7, 1994, he mentioned the name "Jim Herb." At approximately 10:15 a.m., he notes, after the polygraph examination was complete, he stated, "This is pretty serious; maybe I should call someone." When appellant later explicitly asked to speak to counsel, the attorney he asked for was James Herb. Reasoning backwards from that fact, appellant argues that his earlier two references—invoking the name "Jim Herb" and later saying that maybe he should call "someone"—were themselves invocations of his right to counsel, which should have precluded police from questioning him without an attorney.

The Commonwealth responds that appellant was not in police custody at the relevant time and, thus, *Edwards* does not apply; that police, in an abundance of caution, read appellant the *Miranda* warnings does not change that fact. In the alternative, the Commonwealth notes that, although

---

20. *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987); *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977).

21. In addition, in *Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779, 2004 WL 576101 (2004), this Court abrogated the *Davenport/Duncan* rule, finding that voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se.* 845 A.2d at 787, 2004 WL 576101 at *6 .

appellant had mentioned the name Jim Herb, which the officer accompanying appellant recognized as the name of an attorney, appellant did not express any desire to contact Attorney Herb at that time. Further, the Commonwealth argues that appellant's later, vague statement about whether he should call "someone" did not constitute an invocation of his right to counsel.

Since we have determined that appellant was not in police custody at the time he was questioned, appellant's *Edwards* claim, which is predicated upon the assumption that he was in custody, necessarily fails. In addition, we agree with the Commonwealth that the suppression hearing record supports the conclusion that appellant's earlier references were at best equivocal and that he did not, in fact, request to contact an attorney until after he made his affirmative nods. Accordingly, the suppression court properly refused to suppress evidence concerning the head nods.

### III. *Claims of Guilt Phase Trial Court Error*

Appellant raises seven evidentiary claims and three claims that the trial court erred in its charge to the jury. The admissibility of evidence rests within the sound discretion of the trial court, and such a decision will be reversed only upon a showing that the trial court abused its discretion. *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002) (citing *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1193 (1996)).

Appellant's first evidentiary claim is that the trial court abused its discretion by admitting cumulative evidence pertaining to the death of appellant's first wife, which resulted in undue prejudice to appellant and compromised his right to a fair trial. Appellant argues that "twenty-one percent" of the Commonwealth's witnesses testified exclusively about Elaine's death in North Carolina, while a number of the witnesses who testified regarding Maryann's murder also testified about Elaine's murder. Appellant calculates that "fifty-two percent" of the Commonwealth's witnesses testified in whole or in part

about Elaine's death. Given the limited purpose of the evidence to refute any claim that Maryann's death was accidental, appellant argues that the cumulative evidence "inflamed, overwhelmed and confused" the jury. Brief of Appellant, p. 61. The sheer volume of the testimony concerning Elaine's death was, according to appellant, an abuse of the trial court's discretion.

The Commonwealth counters that the testimony of all of the witnesses was within the parameters of the Superior Court's decision, which permitted the Commonwealth to introduce in its case-in-chief the evidence concerning appellant's marriage to Elaine, the circumstances surrounding her death, and appellant's arrest in connection with Elaine's death. A review of the trial testimony indicates that it was, indeed, limited to the areas of inquiry authorized by the Superior Court and was neither cumulative nor excessive. The trial court did not abuse its discretion by permitting the Commonwealth to introduce the precise evidence that the Superior Court order contemplated. Moreover, as noted above, the court's repeated cautionary charges concerning the limited purpose of the evidence served to minimize any potential for unfair prejudice.

Appellant makes a related claim that the trial court abused its discretion in permitting testimony exceeding the scope of the evidence deemed admissible by the Superior Court. Appellant argues that notwithstanding the Superior Court order, the trial court retained the obligation to exercise discretion regarding the evidence permitted at trial, to ensure its relevancy and probative value. Appellant claims that the trial court improperly admitted testimony from various witnesses that was cumulative and which essentially re-tried appellant for the North Carolina murder of Elaine during his Pennsylvania trial. For example, appellant points to witnesses Richard and Nancy Babica, Marianne Rochford, and Police Officer Brenda Vance as providing cumulative testimony regarding the circumstances of Elaine's death. A review of their testimony, however, illustrates that appellant gave inconsistent versions of how he discovered Elaine in the bathtub. Therefore, their testimony was not cumulative.

Appellant also objects to the testimony of Dr. Deborah Radisch, who performed Elaine's autopsy in 1990; North Carolina's Chief Medical Examiner Dr. Joseph Butts, who reevaluated the autopsy results just prior to appellant's arrest in 1994; and Officer Judith Jacobs Hellier, who photographed appellant's scratches and bruises on the day of Elaine's death. The testimony of Drs. Radisch and Butts was not cumulative. In 1990, Dr. Radisch was unable to assign a cause of death, but in 1994, upon reevaluation, Dr. Butts determined that Elaine's death was caused by asphyxiation with aspiration of gastric contents due to chest compression and that the manner of death was homicide. To the limited extent that their testimony overlapped, the repetition was necessary to highlight the differing interpretations of Elaine's injuries. Accordingly, their testimony was not cumulative. Officer Hellier testified very briefly to her observation of scratches, bruises and swelling on appellant's arms and hands immediately after Elaine's death. Because appellant suffered similar injuries on the night of Maryann's death, Officer Hellier's testimony was relevant.

Appellant also complains that the testimony of Christine Cheek regarding Elaine's last will and testament was improperly admitted because it was irrelevant and because Cheek was not an expert as to the validity of wills in North Carolina. Appellant's counsel's only objection to this evidence was to Cheek's testimony regarding the validity of the will, specifically as to the effect of a witness's signature. Cheek did possess sufficient knowledge to testify about the effect of a witness's signature given her employment at the time of Elaine's death as a paralegal in the area of estates and trusts. Further, appellant's counsel subjected Cheek to extensive cross-examination on the subject of her knowledge of estates and trusts. The validity of Elaine's will was questionable because appellant had witnessed it which, under North Carolina law, operated to disinherit him because a beneficiary of a will cannot be a witness to the will.[22] Because the

22. The will, however, was executed in Pennsylvania where the signature of a beneficiary as a witness does not invalidate a will or disinherit the beneficiary.

Commonwealth suggested that appellant may have had a financial motive for killing Maryann, and because the Commonwealth drew parallels between the deaths of appellant's two wives, the testimony regarding Elaine's will was relevant to a possible economic motive for Elaine's murder.[23]

Appellant's third assignment of evidentiary error is that the trial court erred in denying a mistrial following the testimony of Elizabeth Maple. Whether to grant the extreme remedy of a mistrial is a matter falling into the discretion of the trial court. "A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 503 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). Maple, who lived next door to appellant and Elaine in North Carolina, testified that Elaine twice told her appellant was going to kill her, once, a week before Elaine's death and again the day before her death. At one point in her testimony, Maple gave opinion testimony regarding Elaine's state of mind, characterizing Elaine as frightful, terrified and scared, rather than confining her testimony to what Elaine had told her. Appellant objected on grounds that this aspect of the testimony was speculative and opinion-based. The trial court sustained the objection, struck the testimony, and admonished Maple not to state such conclusions. Appellant moved for a mistrial, which the trial court denied, finding that the testimony had not risen to a level requiring a mistrial. In a sidebar discussion, the trial court warned the prosecutor to limit Maple's opinion testimony. The prosecutor promised to ask one follow-up question and move on, which he did. On this record, we are satisfied that the corrective measures taken by

---

**23.** Appellant also makes a brief argument that the testimony of another witness, Kay Falkenhan, concerning her conversations with Elaine Boczkowski, was inadmissible because it was remote in time and did not concern the circumstances of Elaine's death. A review of the testimony suggests no error below; it concerned the problems existing in the marriage, including Elaine's fear of appellant, in the months leading up to her death.

the trial court were appropriate and that the extreme remedy of a mistrial was not required.

Appellant's fourth claim of evidentiary error is that the trial court erred by admitting evidence of hearsay statements, made by appellant's then five-year-old son, as excited utterances. Maple testified that on the night of Elaine's death, appellant requested that she care for his three children while he accompanied Elaine to the hospital. Maple testified that appellant brought the children to her door at approximately 3:00 a.m. and she promptly put them to bed in her daughter's bedroom. The next morning, while Maple was feeding the children breakfast, five-year-old Todd said, "my mommy was screaming so loud last night I had to put my hands up over my ears. She wouldn't stop screaming, and I saw her in the bathroom holding her hands up, and daddy told me to get out." N.T. 4/28/99 at 1495.

Rule 803(2) of the Pennsylvania Rules of Evidence permits the admission of an excited utterance as an exception to the general rule that hearsay evidence is inadmissible. The Rule defines an excited utterance as: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event." In *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 119–20 (2001), this Court held that for a statement to be considered an excited utterance, it must be made spontaneously and without opportunity for reflection:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties. . . . Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective

thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event. *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 712 (1992), quoting *Commonwealth v. Green*, 487 Pa. 322, 409 A.2d 371, 373–74 (1979).

In *Commonwealth v. Pronkoskie*, 477 Pa. 132, 383 A.2d 858, 862–63 (1978), this Court further held that there is no clear-cut rule as to the time sequence required for a statement to qualify as an excited utterance, but rather that fact-specific determination is to be made on a case-by-case basis.

Here, Maple testified that Todd's statement was made spontaneously and not in response to any question from her. It is certainly reasonable to presume that a five-year-old child's hearing his mother screaming would be a shocking experience. As to the delay in time, Todd was taken from his bed in the middle of the night and put to bed in his neighbor's home where he awoke early the next morning. While eating breakfast with Maple and his siblings, he stated, unsolicited, that he had heard his mother screaming loudly in the bathroom and his father told him to leave the bathroom. Given that the child spent the lapse in time sleeping, it is unlikely that his statement was affected by reflection or any outside influences. In addition, the evidence that Elaine had died in the bathtub corroborated that the child was in a position to see and hear the event that he related to Maple. *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 299 (1998). Thus, the trial court did not abuse its discretion in finding that the statement was admissible as an excited utterance.

Appellant next claims that the trial court erred in refusing to allow cross-examination of Detective James Cvetic as to alleged prior acts of misconduct. The scope of cross-examination is a matter left to the sound discretion of the trial court, and the trial court's rulings will not be disturbed absent an abuse of discretion. *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1056 (2003) (citing *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069, 1081 (2001)). Here, appellant sought to introduce evidence that, in an unrelated 1996 homicide case, Detective Cvetic had failed to turn over evidence

because he was aware that the District Attorney is required to disclose such evidence to the defense. Appellant argues that this evidence was relevant in this case because Detective Cvetic had discarded a sample of water taken from appellant's hot tub and evidence from the prior case would have demonstrated a course of conduct on the part of the detective toward capricious, illegal and/or arbitrary conduct. The trial court disallowed the evidence, finding it collateral and irrelevant. *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293 (1996). We find no abuse of discretion.

Detective Cvetic testified that he did not submit the hot tub water sample to the crime lab in this case because he learned after taking it that appellant had drained and cleaned the hot tub between the time of Maryann's death and the time the sample was taken. N.T. 4/20/99 at 611, 614. The evidence which appellant sought to elicit on cross-examination was that a judge dismissed a 1996 homicide case due to inconsistencies in Detective Cvetic's response to being ordered to disclose the identities of confidential informants. Specifically, when the detective was ordered to disclose the identity of two informants, he disclosed one informant's identity and then stated that the two informants were actually only one person.

The Commonwealth maintains that the issue in the previous case was not one of dishonesty on Detective Cvetic's part but rather confusion regarding two separate reports recounting information received from confidential informants. Moreover, the Commonwealth notes that a police practice or policy concerning confidential informants says little about a practice of handling or testing physical evidence, much less does it prove that a police officer routinely mishandles investigations. The trial court did not abuse its discretion in ruling that appellant's attenuated theory did not alter the fact that the evidence he offered was collateral and irrelevant.

■ Next, appellant contends that the trial court abused its discretion by denying a motion to strike the testimony of Randy Erwin, appellant's fellow inmate at the Allegheny County Jail. Erwin testified that he kept notes of conversa-

tions he had with appellant about the deaths of both of appellant's wives during a three-week period when both were incarcerated at the Allegheny County Jail. At one point, according to Erwin's testimony, he asked appellant why appellant killed both of his wives the same way, to which appellant responded, "I don't know. That was stupid, wasn't it." N.T. 4/26/99 at 1228. Appellant complains that he was never provided with the notes Erwin took in jail, despite the fact that Erwin testified during cross-examination that he had turned the notes over to detectives and in the face of repeated requests to the prosecution that any such notes be disclosed. Appellant claims that Erwin's testimony should have been stricken as a remedy for the Commonwealth's discovery violation.

At sidebar, the prosecutor informed the trial court that he was unaware that Erwin had provided any notes to the detectives. The detectives' written report of Erwin's interview indicates that Erwin took notes but not that he provided them to the detectives. Even if it is assumed that Erwin's testimony proves that his notes in fact were turned over to detectives, we see no error in the denial of the motion to strike. This Court has held that the Commonwealth does not violate disclosure rules when it fails to turn over evidence it does not possess and of which it is unaware. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997).[24] The trial court did not abuse its discretion in finding that the Commonwealth either did not possess the notes or was unaware that they existed and that, consistently with *Gribble*, the Commonwealth did not violate rules of disclosure.

Appellant's final evidentiary claim is that the trial court abused its discretion by permitting Randy Erwin to give opinion testimony as to appellant's demeanor when he stated that it was stupid to kill both of his wives in the same manner.

---

**24.** Pursuant to *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001), the *Gribble* decision does not apply to exculpatory evidence in possession of the government (even if not in the prosecutor's possession). The evidence here, however, is inculpatory in nature, and is therefore still governed by *Gribble*.

Erwin testified that appellant was "serious" when making that statement. Without citing to any authority, appellant now contends that this testimony constituted a subjective opinion as to appellant's state of mind and improperly bolstered the credibility of the statement. The Commonwealth responds that a lay witness is permitted to express an opinion on a matter falling within the realm of common knowledge, experience or understanding. *See Counterman,* 719 A.2d at 301. The Commonwealth notes that Erwin testified that he and appellant "hit it off" in jail and that this circumstance ultimately led to appellant's incriminating statements. Thus, the witness's demeanor testimony was based upon personal observation. We agree with the Commonwealth that it was within the trial court's sound discretion to admit this testimony as falling within the realm of common knowledge, experience and understanding.

Appellant's next three assignments of error relate to the trial court's charge to the jury. Appellant first claims that he was entitled to a charge on voluntary manslaughter because the evidence would have supported a jury finding that the killing occurred in the heat of passion. Appellant contends that the scratches on his neck and the nick on his thumb are indicative of a physical altercation, possibly initiated by Maryann, that resulted in her death. The Commonwealth counters that the evidence in this case did not support a voluntary manslaughter charge.

"A defendant is entitled to a voluntary manslaughter charge only when the evidence adduced at trial would support such a charge," *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 353 (1999) (citing *Commonwealth v. Browdie,* 543 Pa. 337, 671 A.2d 668, 674 (1996); *Commonwealth v. Williams,* 537 Pa. 1, 640 A.2d 1251 (1994)), and where the offense has been made an issue in the case. *Browdie.* A person commits voluntary manslaughter when he kills another without lawful justification if, at the time of the killing, he is acting under a sudden and intense provocation by the person killed. 18 Pa.C.S. § 2503(a). Here, appellant's sole theory of defense at

trial was that Maryann's death was an accident. Moreover, although appellant gave various accounts of his wife's death, there was no evidence presented which suggested that appellant and his wife had a physical altercation which led to her death. Appellant told Detective Cvetic that he and Maryann were "kissing" and "getting romantic" in the hot tub shortly before Maryann's death. N.T. 4/20/99 at 583. Another police officer, Officer W. Barrett, overheard appellant tell his mother that he had quarreled with Maryann earlier that day but that they had resolved their issues; appellant then went inside the house and when he returned, found Maryann under the water. N.T. 4/16/99 at 224. In addition, appellant told a paramedic at the scene that he and Maryann were in the hot tub celebrating an upcoming event, he left to take a shower, and when he returned approximately fifteen minutes later, Maryann was unconscious and face-up in the hot tub. *Id.* at 339. On this record, the trial court did not err in refusing to charge the jury on voluntary manslaughter.

Appellant next claims that he was entitled to a jury instruction on involuntary manslaughter. The test here is the same as the test for the availability of a voluntary manslaughter charge, *i.e.*, it is required only if the offense has been made an issue and the trial evidence would support it. *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399, 402 (1980). "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S. § 2504(a). Appellant argues that the jury could have found that he acted recklessly or grossly negligently when he left his intoxicated wife in the hot tub alone, where she drowned. The physical evidence, however, including the bruising and injuries indicating that Maryann had died from manual strangulation, would not support an involuntary manslaughter conviction and, once again, appellant defended on an accident theory. Therefore, the trial court properly declined to charge the jury on involuntary manslaughter.

Finally, appellant contends that the trial court erred in failing to instruct the jury that it could draw an adverse inference from the Commonwealth's failure to introduce into evidence a chemical analysis of the sample of water taken from the hot tub as well as fluid found in Maryann's sinus cavity. The hot tub fluid in question was discarded and never processed by the crime lab, and the sinus cavity fluid was never extracted or analyzed. The record does not support appellant's claim that he was entitled to an adverse inference instruction. Detective Cvetic testified that the hot tub water was not submitted to the crime lab because appellant had drained and cleaned the hot tub prior to the sample being taken. Thus, evidence pertaining to any analysis of the water would have been irrelevant. As for the fluid in Maryann's sinus cavity, both Commonwealth and defense experts agreed that the presence of the fluid was an indication of drowning. Thus, it was the presence of the fluid, not its composition, that was pertinent to appellant's defense of accidental death. Therefore, this claim fails.

## IV. *Claim of Error Respecting Penalty Phase*

Appellant raises a single claim of error relating to the penalty phase. Appellant argues that the trial court erred in denying his motion to quash the aggravating circumstance, *i.e.*, that he had been convicted of another murder committed before or at the time of the offense at issue, because that circumstance arose as a result of the Commonwealth's violating a pre-trial order which had stayed appellant's extradition to North Carolina until the murder charge in Pennsylvania was resolved. We agree that this aggravating circumstance should have been quashed.

Shortly after appellant was arrested and charged with Maryann's murder, North Carolina authorities lodged a detainer and initiated extradition proceedings in order to try appellant for the murder of Elaine Boczkowski. Then Pennsylvania Governor Robert Casey issued an Executive Warrant directing that appellant be returned to North Carolina. The letter transmitting the Warrant to the Allegheny County District

Attorney's Office related that the Governor "had no objection to delaying the delivery of [appellant] until local charges are disposed of, if any are pending." Thereafter, at a February 15, 1995 hearing before the Honorable Kathleen A. Durkin of the Court of Common Pleas of Allegheny County, the Commonwealth presented the Warrant along with the supporting extradition papers from North Carolina. The Commonwealth requested that the court order appellant extradited to North Carolina, but asked for a stay of extradition pending disposition of the instant charges "including sentence, if applicable." Appellant indicated his agreement with the order of extradition and the stay. That same day, Judge Durkin entered an "Order of Court to Extradite Fugitive" ordering extradition, but stayed the order "pending disposition of local charges."

On October 5, 1995, the Commonwealth filed its interlocutory appeal to the Superior Court from Judge Cercone's order granting in part appellant's motion in limine. Thereafter, on October 20, 1995, Deputy District Attorney W. Christopher Conrad of the Allegheny County District Attorney's Office "gave his permission" for the Allegheny County Jail to release appellant to North Carolina authorities for trial there on the charges arising from the killing of Elaine Boczkowski. The Commonwealth's action in this regard was unilateral; it never sought court modification of the stayed extradition order to authorize an immediate transfer of appellant. In accordance with DDA Conrad's directive, appellant was delivered to North Carolina authorities on October 27, 1995. On November 1, 1996, following a capital trial, appellant was convicted of the murder of Elaine Boczkowski in North Carolina and sentenced to life imprisonment. Six days later, on November 7, 1996, DDA Conrad filed a notice pursuant to Pa.R.Crim.P. 352 (since renumbered Rule 801) of the Commonwealth's intention to seek the death penalty in the case *sub judice*, listing as the single aggravating circumstance that appellant had been convicted of another murder committed before the offense at issue. 42 Pa.C.S. § 9711(d)(11).

On March 26, 1999, following his unsuccessful attempt to avoid extradition from North Carolina, appellant filed a "Mo-

tion to Quash Aggravating Circumstance and Decertify Capital Case" in the court below. A hearing was held on April 4, 1999, following which Judge Cercone denied relief.

Appellant argues that Judge Durkin's order staying extradition was a valid one that was never lifted, vacated or modified by any court. Therefore, the District Attorney's Office had no authority to act in contravention of that order and transfer appellant to North Carolina before the Pennsylvania charges were disposed. Had appellant not been unlawfully transferred to North Carolina, the factual basis for the single aggravating circumstance would not have existed and appellant would not have been eligible for the death penalty. Appellant argues that the Commonwealth should not be permitted to benefit from its blatant violation of the stayed extradition order, and he should be afforded some remedy. Appellant concludes that quashal of the single aggravating circumstance and a concomitant vacatur of the sentence of death is the appropriate remedy because it would restore the status quo ante, *i.e.*, it would place the parties back in the positions which existed before the Commonwealth's violation of the court order.

The Commonwealth does not dispute that its action in transferring appellant to North Carolina led to the creation of the aggravating circumstance it later relied upon to certify that this had now become a capital prosecution. The Commonwealth nevertheless argues that it did not engage in a "willful or intentional" violation of the stayed extradition order. This is so because there was a change in circumstances—appellant's having successfully moved to exclude certain Commonwealth evidence and the pendency of the Commonwealth's pre-trial appeal from the trial court's order excluding that evidence—which precipitated the Commonwealth's decision to transfer appellant to North Carolina. Because the Pennsylvania trial proceeding had "halted for a valid reason," the Commonwealth argues, its returning appellant to North Carolina was reasonable. Furthermore, that action ensured that appellant's right to a speedy trial in North Carolina was not impeded by the appellate delay here.

The Commonwealth further argues that absent "purposeful abuse" by prosecution authorities, the aggravating circumstance and ensuing death penalty here should not be set aside. As proof that it was not deliberately seeking to arrange for the creation of the aggravating circumstance, the Commonwealth notes that it was the party that originally requested the stay of extradition, a fact indicating that it was fully prepared to try the matter as a non-capital case. The intervening dispute over appellant's partially successful motion in limine then changed the circumstances. The Commonwealth emphasizes that the fact that it prevailed upon its interlocutory appeal shows that it pursued that appeal in good faith. Because it did not seek the death penalty for an improper reason and because the aggravating circumstance unquestionably did exist by the time of trial, the Commonwealth concludes that appellant is entitled to no relief.

This Court's power of review of a sentence of death is summarized in the Sentencing Code as follows:

**(h) Review of death sentence.—**

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)[.]

(iii) Deleted.

(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence, then it shall remand for the imposition of a life imprisonment

sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).

42 Pa.C.S. § 9711(h). The Code thus recognizes this Court's inherent power to correct errors, *id.* § 9711(h)(2), and also suggests specific statutory bases for relief from a sentence of death. *Id.* § 9711(h)(3).

Upon review, we find that this sentence of death cannot stand under Section 9711(h)(3)(i)'s proscription against sentences that are the product of passion, prejudice or any other arbitrary factor. Our capital sentencing scheme encompasses two separate decisions, one governing eligibility and one governing selection. *See Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 257 (2000) (Saylor, J., joined by Zappala and Cappy, J., concurring) (citing *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994)).

> In the eligibility determination, the statutory scheme must narrow the class of persons for whom the death penalty applies and justify the imposition of such penalty as compared to others found guilty of murder. *See Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). One means of narrowing the class is by prescribing aggravating circumstances that must exist before the death penalty can be imposed, which serves to appropriately channel the sentencer's discretion. *See Blystone v. Pennsylvania,* 494 U.S. 299, 306–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). The selection decision is implicated when the sentencer decides whether a defendant who is eligible for the death penalty should in fact receive that sentence. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2635.

750 A.2d at 258. In Pennsylvania, of course, the Sentencing Code narrows the class of eligible person through a list of specific aggravating circumstances. *See* 42 Pa.C.S. § 9712(d) (specifying eighteen aggravating circumstances). The complaint here does not involve the selection decision by the jury, but the death eligibility stage: *i.e.,* whether the circumstances under which appellant became death eligible were a result of

passion, prejudice or some other arbitrary factor. We believe those circumstances introduced an impermissible element of arbitrariness into the eligibility decision.

The Uniform Criminal Extradition Act, 42 Pa.C.S. §§ 9121–9148, authorizes the Governor of Pennsylvania to retain a person who is the subject of a request for extradition by another state, if criminal charges are also pending in Pennsylvania, until such time as the individual "has been tried and discharged or convicted and punished in this Commonwealth." *Id.* § 9140. The trial court in this case entered an order, consistently with the request and agreement of the parties (and consistently with the expression of the Governor) to do exactly that—*i.e.*, to keep appellant in Pennsylvania until the charges *sub judice* were finally disposed. Nothing in the Extradition Act authorizes a prosecutor or any other party to ignore, undermine or negate an order staying extradition and transfer a criminal defendant to another jurisdiction. The District Attorney's Office here transferred appellant to North Carolina to be tried for murder in direct violation of a valid court order.

The Commonwealth's after-the-fact explanations do not justify its violation of an existing, clear, and unambiguous court order. If the Commonwealth felt that circumstances had changed and warranted reconsideration or modification of that order to provide for immediate extradition, it should have sought that relief from the court. Such a procedure would have afforded appellant an opportunity to be heard and to challenge the request and would have ensured that a neutral judicial officer made the ultimate legal determination. It may well be that a motion to lift the stay would have been granted, given the change in circumstances represented by the delay occasioned by the Commonwealth's decision to appeal. But, that is not the point. When a governing court order exists, it is for the court and not a party to unilaterally modify or nullify that order. However intentioned, whether good or evil, a party is not authorized to ignore controlling court orders based upon its own view about the existence and effect of a change in circumstances.

An action or factor is arbitrary if it is not cabined by law or principle. *See, e.g. Black's Law Dictionary* 100 (Seventh Ed.1999) (defining arbitrary as, *inter alia:* "1. Depending on individual discretion; specif., determined by a judge rather than by fixed rules, procedures, or law. 2. (Of a judicial decision) founded on prejudice or preference rather than on reason or fact...."); *Merriam–Webster's Collegiate Dictionary* 59 (10th Ed. 2002) (defining arbitrary as, *inter alia:* "1: depending on individual discretion (as of a judge) and not fixed by law ... 2a: not restrained or limited in the exercise of power: ruling by absolute authority ... 3a: based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something...."). The Commonwealth's action in this case was clearly arbitrary: it usurped the role of the tribunal assigned, in our system of separated powers, to determine whether the stay should be lifted. Moreover, in addition to violating an existing court order, the trial prosecutor's unauthorized conduct ultimately created the basis for the Commonwealth to newly certify appellant as death-eligible, and to convert what had been a non-capital prosecution into a capital one. By taking an unlawful action which led to the creation of an aggravating circumstance that did not exist when the court had ruled on extradition, the Commonwealth introduced an element of arbitrariness into the death-eligibility process. In such a circumstance, we are constrained to hold that this sentence of death, which depended upon that circumstance, was the improper product of an arbitrary factor.[25] Consistently with the legislative mandate, we hold that the aggravating circumstance specified below should have been quashed and, because this was the only aggravating circumstance specified by the Commonwealth, we must vacate the sentence of death and remand

**25.** We do not inquire into the representations presently made by the Commonwealth that the prosecutor here (who was not called to testify at the hearing below) acted in good faith at each step, and not for some "nefarious" or improper motive. However motivated, the ineradicable and controlling fact remains that the prosecutor's action injected an element of arbitrariness into the determination of death eligibility which, under the Sentencing Code, requires that the sentence of death be vacated.

for imposition of a sentence of life imprisonment. 42 Pa.C.S. § 9711(h)(4).

Having found appellant's claims of pre-trial and guilt phase error to be meritless, we affirm appellant's conviction for first degree murder. Appellant's claim of penalty phase error, however, compels us to vacate the sentence of death and remand to the trial court for imposition of a sentence of life imprisonment. Jurisdiction is relinquished.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion in which Justice NIGRO joins.

Justice EAKIN files a concurring and dissenting opinion.

Justice SAYLOR concurring.

I join the majority opinion, in all respects but the following.

I have greater difficulty than does the majority with the admission of hearsay evidence concerning Elaine Boczkowski's fear of Appellant in the months leading up to her death. *See* Majority Opinion, *op.* at 454–56 & n. 23, 846 A.2d 94–95 & n. 23. The question of admissibility implicates an area of this Court's jurisprudence that has been the subject of recent differences, namely, the relevance of a victim's state of mind in a first-degree murder case. *Compare, e.g., Commonwealth v. Stallworth,* 566 Pa. 349, 364, 781 A.2d 110, 118 (2001) (taking a broad view of relevance concerning a victim's perception of her deteriorated relationship with the accused in a first-degree murder trial), *with Commonwealth v. Laich,* 566 Pa. 19, 27 29, 777 A.2d 1057, 1061–62 (2001) (reflecting a narrower view concerning the relevance of victim-state-of-mind evidence). *See generally Stallworth,* 566 Pa. at 383–85, 781 A.2d at 130 (Saylor, J., concurring and dissenting). I note, however, that, even under the narrower view, evidence concerning a victim's state of mind may be relevant in limited circumstances, includ-

ing, *inter alia,* those entailing a defense claim of accidental death. *See generally id.* at 382–83 & n. 4, 781 A.2d at 129 & n. 4.

In this case, although early on in the trial defense counsel avoided a direct contention that Maryann Boczkowski died as a result of an accident, from the outset counsel challenged the prosecution as one-sided and unfair, claiming that "we will show you through very competent professional testimony that this case is not a homicide," but rather, that "Maryann had serious health conditions which contributed to and caused her death." N.T., Apr. 15, 1999, at 59–60 (defense opening statement). It became quite apparent from the circumstances of Maryann Bockowski's death, as well as the evidence developed throughout trial, and was ultimately confirmed in defense counsel's closing statement, that counsel's allusion to health problems encompassed alcoholism and associated physical conditions, *see* N.T., May 6, 1999, at 1907 (defense closing statement), and that the alternative to homicide that he was suggesting was accidental death due to drowning. *See, e.g., id.* at 1944, 1961. In light of the defense's theory of accidental death, which was shaped from the outset of the case, I agree with the majority that the trial court did not abuse its discretion in discerning relevance of the state-of-mind evidence in the Commonwealth's case-in-chief.[1] Notably, as well, Appellant does not presently challenge the admission of the evidence under Pennsylvania Rule of Evidence 403's requirement that the probative value outweigh potential prejudice. *See* Pa.R.E. 403. *See generally United States v. Brown,* 490 F.2d 758, (D.C.Cir.1973) (discussing the risk of prejudice in the admission of victim-state-of-mind evidence); McCormick on Evidence § 276 (5th ed. 1999) (same).

Justice NIGRO joins this concurring opinion.

1. I acknowledge that the case is particularly close, because the evidence at issue did not relate to the actual victim's state of mind, but to that of Appellant's former wife. I agree, nevertheless, with the majority's assessment concerning the relevance of such evidence in the unique circumstances presented. *See* Majority Opinion 577 Pa. at 441–47, 846 A.2d at 87–90.

Justice EAKIN concurring and dissenting.

I join the majority opinion with respect to appellant's guilt, but dissent from the majority's decision to remand for imposition of a life sentence.

The Commonwealth requested a court order extraditing appellant, but asked this extradition be stayed pending disposition of the Pennsylvania charges "including sentence, if applicable." Extradition Hearing, 2/15/95, at 3. At the hearing, defense counsel reviewed all the extradition paperwork and acknowledged it was in order. Counsel did not object to appellant's return to North Carolina and agreed to have the Pennsylvania charges disposed of first; the court granted the Commonwealth's request. Id.

After the trial court granted appellant's unrelated motion *in limine,* the Commonwealth filed an interlocutory appeal. There is no suggestion, much less evidence, that the Commonwealth filed this appeal in order to procure an aggravator. This appeal was necessary, as the trial court erred in precluding certain evidence which substantially handicapped the Commonwealth's case. *See* Pa.R.A.P. 311(d) (Commonwealth may seek appellate review of pretrial order which excludes Commonwealth evidence and thereby substantially handicaps its prosecution). Because of the appeal, the Commonwealth let appellant go to North Carolina, but did so without asking the trial court to lift the stay. The majority concludes these circumstances "introduced an impermissible element of arbitrariness into the eligibility decision." Majority Opinion, 577 Pa. at 464–66, 846 A.2d at 101.

The good faith representation of the District Attorney, an elected official and an officer of the court, was necessary for the appeal, and was alone sufficient to dispel the unwarranted accusation of arbitrariness. Still, it is worth noting that the Commonwealth was successful on appeal, but not until nearly 19 months after appellant's conviction in North Carolina. The nature of the appeal and the indeterminate amount of time it would (and did) take made it appropriate to release appellant to North Carolina, which was prepared to try appellant's case,

nearly 10 years in the making. The Commonwealth's decision to forgo their priority position and allow his return to North Carolina was mere common sense, not arbitrariness, and was based upon sound reasoning and judicial economy.

The real issue is not extradition, but the unilateral disregard of the stay. Had the Commonwealth moved to lift the stay, there appears no reason it would not have been granted— there was no real opposition by appellant to extradition beyond assuring the paperwork was in order. The trial court heard appellant's motion to quash the aggravating circumstance and concluded the extradition of appellant to North Carolina was based on a logical and sensible decision. Trial Court Opinion, 10/03/2000, at 9. The trial court saw nothing improper in the fact that extradition took place while the Commonwealth's appeal was pending in Pennsylvania. Id., at 27. Appellant never objected at the pre-extradition hearing, nor did he at the time he was transferred to North Carolina. The trial court did not find the action contemptuous. "[I]t is axiomatic that a court has inherent power to enforce its own orders ... and that this Court will not interfere with enforcement absent an abuse of discretion." *Commonwealth v. Shaffer,* 551 Pa. 622, 712 A.2d 749, 751 (1998) (plurality) (citing *Commonwealth v. Carson,* 510 Pa. 568, 510 A.2d 1233 (1986)). The trial court reviewed the violation of its own order and failed to find any sanction necessary; I see no reason to second-guess its discretion.

Appellant's case in Pennsylvania was postponed for a valid reason and the Commonwealth's action was not "clearly arbitrary." I do not sanction the Commonwealth's unilateral disregard of the stay, but it was a stay that the Commonwealth, not appellant, sought. Allowing the North Carolina charges to proceed expeditiously was the right thing to do. Speedy trial is a right inuring to the accused, not the Commonwealth, and delaying both trials for two more years was not the right thing to do.

Further, the remedy for violating a stay of extradition should not be vacating a valid penalty imposed by the Pennsyl-

vania jury. Hence I must dissent to the portion of my colleagues' decision which reverses that penalty.