J-S28042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GUSSIPPIE RIVERS | : | |
| | : | |
| Appellant | : | No. 1703 EDA 2020 |

Appeal from the Judgment of Sentence Entered December 19, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0000086-2018

BEFORE:  BOWES, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED OCTOBER 14, 2021**

Gussippie Rivers (Rivers) appeals from the judgment of sentence imposed in the Court of Common Pleas of Philadelphia County (trial court) after his bench trial conviction of Endangering the Welfare of a Child (EWOC) and Simple Assault.[1]  Rivers argues that the court erred in allowing the Commonwealth to admit hearsay testimony and to supplement the record with a medical record.  We affirm.

We take the following factual and procedural background from our independent review of the record and the trial court's January 19, 2021 opinion.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 4304(a), 2701(a).

**I.**

Rivers was arrested and charged with EWOC, Simple Assault and related charges[2] on November 27, 2017, resulting from an incident involving one of his two children, J.T.  After a preliminary hearing, Rivers was held on third-degree felony EWOC and misdemeanor Simple Assault.  The trial court conducted a bifurcated trial on May 8, 2018, and July 10, 2018.

**A.**

On May 8, 2018, Ana Gaul-Torres (Torres) testified that she has known Rivers for nine years and they had two children (the Children) together, S.R. was five-years-old and J.T., the victim in this case, was four-years old.  She stated that on Friday, October 13, 2017, she traveled with the Children from Hartford, Connecticut to Philadelphia, Pennsylvania so they could visit their Father, Rivers, for the weekend.  When Torres dropped them off with Rivers, she testified that the Children did not have any bruises.  (**See** N.T. Trial, 5/08/18, at 12-15, 17).[3]

_____

[2] The related charges included Aggravated Assault, Recklessly Endangering Another Person and Strangulation-Applying Pressure to Throat or Neck.  18 Pa.C.S. §§ 2702(a), 2705, 2716(a)(1).

[3] We note with disapproval that Rivers failed to ensure that the certified record contained the transcript for May 8, 2017, although he cites it heavily and it is necessary for our review.  "It is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in the case." **Commonwealth v. Martz**, 926 A.2d 514, 524 (Pa. Super. 2007), _cert. denied_, 940 A.2d 363 (Pa. 2008) (citation omitted).  "It is the responsibility of appellant, not this Court, to provide a complete record for
_(Footnote Continued Next Page)_

The next morning, Saturday, October 14, 2017, Torres spoke with the Children without incident. Later that day, Jayson Colon (Colon), Torres' ex-boyfriend, called her and based on that phone call, she decided that she needed to call the Children. When Rivers answered the phone, he began cursing at Torres because he had heard them call Colon "dad" over the phone. Torres could hear S.R. screaming and crying in the background during this call, but when she asked why S.R. was upset, Rivers said "he had got with them" about calling Colon "dad." Similarly, when Torres asked to speak to S.R. because she was crying, Rivers said, "no, I'm about to get with them," "f[]ck you, I'm done with you," and hung up the phone. (*Id.* at 17, 43; *see id.* at 16, 20-23).

Torres explained that during the nine years she had known Rivers, he had stated that he was "about to get with" her more than four times, and this phrase would be followed by him doing something physical to her. Based on that history, Torres believed Rivers was going to get physical with the

---

review, including ensuring that any necessary transcripts are included in the official record." *Commonwealth v. Peifer*, 730 A.2d 489, 493 n.3 (Pa. Super. 1998), *appeal denied*, 743 A.2d 918 (Pa. 1999). (citations omitted) "A failure by [A]ppellant to insure that the original record certified for appeal contains sufficient information to conduct a proper review constitutes waiver of the issue sought to be examined." *Martz*, *supra* at 524 (citation omitted). However, because this Court, with the cooperation of the trial court, was able to obtain the missing certified transcripts to enable our review, we will not waive this appeal. *See Commonwealth v. Preston*, 904 A.2d 1, 7-8 (Pa. Super. 2006), *appeal denied*, 916 A.2d 632 (Pa. 2007).

Children. She texted Rivers that she wanted to come pick up the Children that night, but he responded not to bother because they would not be at home. She admitted she did not call the police about the incident. As far as Torres was aware, the Children were in Rivers' exclusive custody at his home the entire weekend. (*See id.* at 17-19, 23, 43-44).

On Monday morning, October 16, 2017, Torres picked up the Children when Rivers dropped them off at the courthouse. Torres and Rivers and their Children and respective counsel had a scheduled contempt hearing involving whether Rivers was allowed to see the Children as ordered. However, it had been cancelled at the last minute. She testified that she did not see any marks on J.T. at that time. She stated that usually, she and Rivers would converse when he would drop the Children off, even when they were in "disagreement" and he would then drop her off wherever she needed to go. However, on this particular day, he gave her the Children's belongings, appeared upset and did not say anything to her before leaving. (*See id.* at 23-24, 66, 76, 80).

Immediately after Rivers left, Torres took the Children into the restroom to make sure they did not have to use it before they left, as she usually did. However, they did not have the opportunity "to use the bathroom because [S.R.] was very excited and she wanted to tell [her] and show [her] what had happened at [Rivers'] home." (*Id.* at 25). S.R. pulled down J.T.'s shirt collar and Torres observed gashes on his chest and bruises on his neck. Over defense counsel's hearsay objection, the trial court allowed Torres to testify

- 4 -

about what S.R. told her about the injuries pursuant to the excited utterance exception.[4]  Torres testified that S.R. reported that Rivers grabbed J.T. by his

_____

[4] The Commonwealth and A.G.-T. engaged in the following exchange about what S.R. told her and her demeanor:

Q: So, you went to the bathroom.  Tell us what happened and describe [S.R.]'s demeanor.

A: They didn't want to do anything but talk to me.

\* \* \*

Q: So, describe their voice and their tone.  Describe what, if anything, you said to them and what they did next.

A: Well, they were excited.  That's when she showed me his bruises, the gashes on his chest and the choke marks on his neck ….

\* \* \*

Q: So, when you were in the bathroom, could you describe what [S.R.]'s demeanor was and what she said as a result of that demeanor?

A: She was very excited, and she said —

\* \* \*

Q: And so could you please describe your daughter's tone of voice before you say anything about what someone said?

A: She was loud.

Q: And what is her voice typically?  How is her octave usually?

A: She's usually calm and very sweet.  But this time she was loud and wanted me to hear what she had to say.

*(Footnote Continued Next Page)*

shirt collar and was screaming and yelling and squeezing his neck on the bed. S.R. also saw blood on the floor. Torres immediately advised her attorney what S.R. had just told her and then took the Children to the Department of Human Services where they gave statements and pictures were taken. She

_____

> Q: And what about her behavior and demeanor? Were there any hand gestures?
>
> A: She was moving around to pull down [J.T.]'s shirt and his collar.
>
> * * *
>
> Q: When you went to the bathroom, did you ask your children any questions?
>
> A: No.
>
> Q: When you went to the bathroom, did your children voluntarily begin speaking to you?
>
> A: Oh, yes. Yes.
>
> Q: Were you able to initially calm your children down?
>
> A: Not until after the DCF building.
>
> Q: How long a time was that?
>
> A: That was a good maybe two hours.
>
> Q: And in that excited state[], what did [S.R.] say?
>
> Defense counsel: Same [hearsay] objection.
>
> The Court: Overruled. She's laid a foundation now.

(*Id.* at 29-30, 37-40).

then took J.T. to St. Christopher's Medical Hospital for Children where more pictures were taken and she filed a police report, and then she and the Children went to the Philadelphia Police Special Victim's Unit (SVU) where the three were interviewed and more photographs were taken. (**See id.** at 23-25, 29-31, 37-41).

The Commonwealth marked the SVU photos taken of J.T.'s neck and chest on October 16, 2017, as Exhibits C-1 and C-2. Torres testified that she was present when the photographs were taken and that they were a fair and accurate description of what her son looked like on the day in question. They depicted deep gash marks on J.T.'s chest and what appeared to be choke marks on his neck, which Torres testified were not there when she had dropped them off to Rivers the previous Friday. (**See id.** at 32-33, 35-36).

The trial was continued until July 10, 2018. On that day, the Commonwealth presented the testimony of Philadelphia Police Officer Vondel Cook. Officer Cook was a 14-year police veteran who had worked in the SVU for four years and was assigned to this matter. In addition to her experience as a police officer, Officer Cook had 20 years of experience working with young children in her roles as a social worker and teacher. On October 16, 2017, she separately interviewed Torres, S.R. and J.T. She identified Exhibits C-1 and C-2 as the photographs she took on October 16, 2017, based on what J.T. had reported, and she testified that they accurately showed bruising on the left side of J.T.'s neck and slash marks going across his chest. She stated that

J.T. was nervous on the day she interviewed him but was able to discuss his injuries and tell her what happened. Although she admitted that she did not note in her report that he was nervous, Officer Cook explained that she would not have put personal thoughts or opinions in a police report. She also testified that the statements of both Children and Torres were consistent. (*See* N.T. Trial, 7/10/18, at 8-11, 13, 15-19, 22-24, 37-39).

At the end of its case, the Commonwealth marked J.T.'s medical records from St. Christopher's Medical Hospital for Children as Exhibit C-5. Defense counsel objected, arguing that although the documents contained a certification that they were the official, confidential medical records of J.T. sent in response to the Commonwealth's subpoena, the Commonwealth failed to have them properly certified pursuant to Rule 902 and that, therefore, they were not self-authenticating pursuant to Rule 803(6). The trial court overruled the objection and admitted the records from St. Christopher's because it found that the cover letter sent with the medical records, along with the subpoena sent to St. Christopher's requesting the documents, satisfied Pennsylvania Rules of Evidence 803(6) and 902(11). Over defense objection, the court also permitted the record to stay open, stating, "[i]f the Commonwealth wishes to supplement its case with a certification … we can leave the record open for you to submit it at a later date." (*Id.* at 55). Exhibit C-5 was then admitted into evidence and the Commonwealth rested. (*See*

*id.* at 40-42, 48-53, 55-56, 58-59). There is no indication in the record that the Commonwealth provided such certification.

At the close of the Commonwealth's case, Rivers moved for judgment of acquittal on the felony EWOC charge, which the trial court granted, changing the EWOC grading to a first-degree misdemeanor. (***See id.*** at 59, 65).

### B.

Gwendolyn McLean (McLean) then testified on behalf of Rivers. She testified that at the time of the incident, she had been River's companion for approximately a year and that she was with him on the weekend in question. She stated that she did not see any marks on J.T., but that she did not see him with his shirt off. She stated that the Children appeared to be enjoying themselves and neither child complained about Rivers beating J.T. and J.T. did not say he was in pain. She testified that the police did not interview her and her only contact with them was when they came to the house with a warrant for River's arrest. (***See id.*** at 67-69, 72-73, 75-76, 81).

Rivers testified that at the time the Children came to his house for court-ordered visitation on October 13, 2017, he was trying to get full custody of them. He took the Children to buy sneakers for S.R. that night because S.R. was wearing sandals. On Saturday morning, October 14, 2017, S.R. received a phone call from a male who identified himself as her brother and she spoke with him. The Children also called Torres that morning as they usually did.

Rivers then took them clothes shopping because Torres did not provide them with clothing. Rivers testified that although McLean was present that weekend, there were times when he was alone with the Children. He also stated that while he would not want them to call another man daddy, he would not become angry if it did happen. (*See id.* at 91, 97-98, 124).

He testified that he met Torres inside the courthouse with the Children on the morning of Monday, October 16, 2017, because the entire family was supposed to be in court for a contempt hearing since he was not seeing the Children as ordered. Both he and Torres had counsel present. When he, his counsel and the Children arrived, they waited in the hallway outside the courtroom and Torres was in a conference room with her attorney. The Children were acting normal and were excited to see their mother when she came out of the conference room. They did not complain to her at that time that J.T. had been struck. When shown the photographs of J.T. taken later that day, Rivers stated that he did not cause the marks on him and neither child had complained of any pain all weekend. He stated that after he provided Torres with the Children's belongings, he and his counsel left. (*See id.* at 91-93, 100-04, 106).

**C.**

The court took the matter under advisement and on September 28, 2018, it found Rivers guilty of first-degree misdemeanor EWOC and Simple Assault. On December 19, 2018, after receiving a Pre-Sentence Investigation

report (PSI) and mental health evaluation, the trial court sentenced Rivers to not less than 30 nor more than 60 months' incarceration on the charge of EWOC and a consecutive five years' probation on the Simple Assault charge, with credit for time served. (**See** N.T. Sentencing, 12/19/18, at 27). Rivers did not file a post-sentence motion. He timely appealed on January 14, 2019. He and the trial court have complied with Rule 1925. **See** Pa.R.A.P. 1925.

Rivers presents two questions for this Court's review: (1) Did the trial court err in "allowing Commonwealth witness … [A.G.-T.] to offer impermissible hearsay testimony[;]" and (2) Did the trial court err in "allowing the Commonwealth to supplement the trial record with medical records as a business record absent authentication and a hearsay exception?" (River's Brief, at 7).

## II.

## A.

In his first issue, Rivers argues that the trial court erred in allowing the admission of Torres' testimony[5] regarding what S.R. told her because "the

---

[5] Our standard of review of this issue is well-settled.

> Our standard of review for a trial court's evidentiary ruling is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the

*(Footnote Continued Next Page)*

time lapse of two days between the startling event and the declaration is too broad a chasm in time to permit admissibility of a declaration under the excited utterance exception to the hearsay rule" and Torres' testimony did not establish that "S.R. was still lingering under the spell of a startling event." (Rivers' Brief, at 12). Instead, the Commonwealth merely established that S.R. was excited to report an event to her mother, her custodial parent. (**See id.** at 12-13).

The Commonwealth counters that the trial court was proper in admitting Torres' testimony about what S.R. told her as an excited utterance. It posits that it is not that S.R. remained excited over the entire time after the event, "but that seeing her mother for the first time since the abuse was a subsequent event relating back to the event in question and causing renewed excitement sufficient to trigger an outburst lacking in calm reflection." (Commonwealth's Brief, at 12) (citing 4 Jones on Evidence § 28:15 (7th ed.)). The Commonwealth further argues that even if the court erred in permitting the testimony, it was harmless error where it was merely cumulative of properly admitted evidence of Rivers' guilt. (**See id.** at 14-15).

_____

result of bias, prejudice, ill will or partiality, as shown by the evidence of record.

**Commonwealth v. Melvin**, 103 A.3d 1, 35 (Pa. Super. 2014) (citations omitted).

- 12 -

Hearsay is "a statement the declarant does not make while testifying at the current trial … and … a party offers in evidence to prove the truth of the matter asserted." Pa.R.E. 801. Hearsay is inadmissible. **See** Pa.R.E. 802. An excited utterance, defined as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is an exception to the rule against hearsay. Pa.R.E. 803(2).

> an excited utterance (1) need not describe or explain the startling event or condition; it need only *relate* to it, and (2) need not be made contemporaneously with, or immediately after, the startling event. It is sufficient if the stress of excitement created by the startling event or condition persists as a substantial factor in provoking the utterance.

Pa.R.E. 803(2), *Comment*. In fact, "there is no clear cut rule as to the time sequence required for a statement to qualify as an excited utterance, but rather the fact-specific determination is to be made on a case-by-case basis." **Commonwealth v. Boczowski**, 846 A.2d 75, 95 (Pa. 2004) (citation omitted). In deciding whether a statement is admissible as an excited utterance, "the court must consider, among other things, whether the statement was in narrative form, the elapsed time between the startling event and the declaration, whether the declarant had an opportunity to speak with others and whether, in fact, she did so." **Commonwealth v. Carmody**, 799 A.2d 143, 147 (Pa. Super. 2002). Importantly, "in circumstances where time has elapsed between an incident and the reporting of the incident by a child to a trusted adult at first given opportunity, such passage of time does not result in inadmissibility of [the] statement under the excited utterance

exception." **Commonwealth v. Toomey**, 248 A.3d 462 (Pa. Super. filed Jan. 5, 2021) (unpublished memorandum)[6] (citing **Commonwealth v. Sherwood**, 982 A.2d 483 (Pa. 2009) (finding excited utterance applied to statements made by child to mother about an incident of abuse that was made after passage of time).

In this case, S.R. witnessed the startling event of Rivers physically assaulting her four-year-old brother. Torres' testimony evidenced that the incident occurred on Saturday, October 14, 2017, when Rivers told Torres that he "had got with" the Children and was "going to get with" them for calling another man dad. Based on Torres' nine-year experience with Rivers, she knew the phrase, "going to get with" meant that Rivers intended to become physical with an individual. (N.T. Trial, 5/08/18, at 16-17). Approximately two days later, S.R. was first able to tell her mother about witnessing the assault, which she immediately did when she got away from Rivers, acting uncharacteristically excited and loud before showing her mother her brother's injuries and telling her what happened.

Based on the foregoing, we discern no abuse of discretion where the trial court was not manifestly unreasonable in admitting Torres' testimony

---

[6] Unpublished memoranda "filed after May 1, 2019, may be cited [by the Court or a party) for their persuasive value, pursuant to Pa.R.A.P. 126(b)." Pa. Super. Ct. I.O.P. § 65.37.

about S.R.'s statement under the excited utterance exception.[7] **See Melvin**, **supra** at 35.

Moreover, we agree with the Commonwealth that even assuming *arguendo* the trial court did abuse its discretion in admitting the testimony, it was harmless error.[8] **See Commonwealth v. Mitchell**, 902 A.2d 430, 452 (Pa. 2006) ("[A]n erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error is harmless.").

> An error will be deemed harmless if: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

---

[7] Rivers seems to argue that the Commonwealth should have presented the Children's testimony under the tender years exception, rather than by having that evidence introduced through Torres, and that he was denied his constitutional right of confrontation by its failure to do so. It is not clear if he raised this issue at trial in response to the Commonwealth admitting S.R.'s testimony as an excited utterance. In any event, he fails to argue that the Commonwealth was required to proceed under the tender years exception and that this somehow renders its course of action error that is dispositive of this issue. (**See** Rivers' Brief, at 14-15).

[8] "The doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt." **Commonwealth v. Thornton**, 431 A.2d 248, 266 (Pa. 1981) (citation omitted). "Its purpose is premised on the well-settled proposition that a defendant is entitled to a fair trial but not a perfect one." **Id.** (citation, quotation marks and brackets omitted).

*Mitchell*, *supra* at 457 (citation omitted).

Our review of the record confirms the Commonwealth's observation that S.R.'s statement was cumulative of other properly admitted evidence of Rivers' guilt. Torres properly testified to her own observations of J.T.'s injuries. The Commonwealth introduced photographs taken on October 16, 2017, which both Torres and Officer Cook testified accurately showed the injuries to J.T.'s neck and back. Torres testified that on Saturday, October 14, 2017, Rivers threatened to cause the Children physical violence while S.R. screamed from the background. Both Rivers and McLean testified that the Children were with Rivers the entire weekend, including times when he would be alone with them, establishing that the injuries could not have been caused by anyone else.

Even assuming *arguendo* that the court abused its discretion in allowing Torres to testify about what S.R. told her about the incident, this testimony was cumulative of other properly admitted evidence that established Rivers' guilt and, therefore, its admission was harmless error. *See Mitchell*, *supra* at 452, 457.

**B.**

In his next issue, Rivers argues that "the trial court erred in allowing the Commonwealth to supplement the record in the form of [an] uncertified medical record." (Rivers' Brief, at 16) (emphasis omitted). He argues that the medical record was inadmissible because the Commonwealth did not

either have the custodian of records testify that it was a business record pursuant to Pennsylvania Rule of Evidence 803(6)[9] or provide the defense with a certification that complies with Rule 902(11)[10] in advance of trial. (**See id.** at 17-18).

_____

[9] Pennsylvania Rule of Evidence.803(6) provides:

> Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).

[10] Pursuant to Pennsylvania Rule of Evidence 902, certain items of evidence are self-authenticating and require no extrinsic evidence of authenticity in order to be admitted. Section (11) of that Rule provides:

> Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the

*(Footnote Continued Next Page)*

The Commonwealth responds that this issue is waived for Rivers' failure to raise the claim in his Rule 1925(b) statement of errors and for failing to ensure the certified record contains the documents necessary for our review. It also argues that even assuming *arguendo* that he had not waived this issue, the claim would lack merit because the records had no effect on the case's disposition, and even if the court abused its discretion, the decision was harmless where it did not impact the outcome of the case. (**See** Commonwealth's Brief, at 15-19).

**1.**

It is axiomatic that issues not raised in a Rule 1925(b) statement are waived. **See Commonwealth v. Bebout**, 186 A.3d 462, 471 (Pa. Super. 2018) (waiving appellant's argument that differed from that raised in Rule 1925(b) statement); Pa.R.A.P. 1925(b)(7)). In Rivers' Rule 1925(b) statement, he claimed, in pertinent part: "The Trial Court erred and denied [him] the Due Process guaranteed him by State and Federal Constitutions, by allowing the Commonwealth to supplment (*sic*) discovery after trial ended **in**

_____

requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

Pa.R.E. 902(11).

**the form of a requisite medical record certification.**" (Rivers' Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), 4/10/19, at 2) (emphasis added). However, in his brief, Rivers challenges the admission of the medical record **itself**, claiming that it was inadmissible because it was not certified as a business record and the Commonwealth failed to provide him with a certification in advance of trial. (**See** Rivers' Brief, at 16-18).

The issue of whether a trial court erred in keeping the record open to allow a party to supplement it with a certification[11] is a different claim than whether evidence of the medical record itself was admissible in the first place.[12] Therefore, the claim that the medical records were improperly

_____

[11] Rivers does not address the issue of whether the trial court erred in keeping the record open to allow the Commonwealth to file the certification. We note that, "trial courts have the inherent discretion to reopen the record on their own and to grant the parties leave to supplement it with evidence regarding a particular issue, as long as neither party is prejudiced." **Commonwealth. v. Safka**, 141 A.3d 1239, 1249–50 (Pa. 2016). Here, there is no evidence that the court's decision to allow the Commonwealth to supplement the record with a certification prejudiced Rivers in any way. Trial in this matter had been bifurcated between May 8, 2018, and July 10, 2018, and after that the court then took the matter under advisement to review the record before issuing a decision. In any event, given that the Commonwealth never supplemented the record with the record, it is difficult to see how Rivers was prejudiced by the court's decision to leave the record open during this time for a certification.

[12] The record reflects that the medical records themselves were admitted before the Commonwealth rested, not after trial, so the Commonwealth did not "supplement" the record with them. (**See** N.T. Trial, 7/10/19, at 58). The record only remained open for the Commonwealth to supplement the case with a certification at a later date if it wished to do so. (**See id.**).

admitted is waived because it was not preserved in his 1925(b) statement. *See Bebout*, *supra* at 471.

**2.**

In claiming that the medical records should not have been admitted, Rivers relies on Pennsylvania Rules of Evidence 803(6) and 902(11). It is undisputed that the Commonwealth moved to admit J.T.'s medical records from St. Christopher's Hospital for Children at the end of its case in chief, and that the custodian of records did not testify to their authenticity pursuant to Rule 803(6)(D). Instead, the court found that the cover letter sent with the medical records and the subpoena sent to St. Christopher's satisfied the requirements of Rules 803(6) and 902(11) because they were certified as being the official medical records.

However, Rivers failed to provide this Court with a certified copy of those documents for our review, so we are unable to determine whether either of them satisfied Rule 902(11), thus rendering them a self-authenticating record. Hence, this claim is waived on this basis as well. *See Commonwealth v. Muntz*, 630 A.2d 51, 58 (Pa. Super. 1993) (claim waived where it is dependent on materials not provided in the certified record).

**3.**

Finally, even had Rivers not waived this claim, our review of the record confirms the Commonwealth's observation that he was not prejudiced by the admission of the medical records because the charges against him did not

require medical proof of specific harm and the parties did not dispute the location of the injuries. Other than when they were moved into evidence, neither the parties nor the court mentioned the records. In fact, the medical records would have been cumulative of the pictures taken by Officer Cook, and the testimony by both her and Torres that they accurately reflected J.T.'s injuries. There was no dispute that J.T. had the injuries, only about whether Rivers caused them, and there is no evidence that the court relied on the records in any way in reaching its verdict. Hence, even if they were erroneously admitted in violation of Rules 803(6) and 902(11), Rivers cannot demonstrate that he was prejudiced by this error and, therefore, it was harmless.[13] *See Mitchell*, *supra* at 452, 457. For all of these reasons, this issue does not merit relief.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 10/14/2021*

---

[13] Similarly, any claim that he was harmed because the Commonwealth failed to provide notice of its intent to offer written certification for the medical records, (*see* Rivers' Brief, at 17), fails because Rivers used more than sufficient time during trial to address the certification and make any arguments against it.